**NELSON v. UNITED STATES**
(two cases).

**NOWLAND v. UNITED STATES**
(two cases).

**LEE v. UNITED STATES.**

**LOWERY v. UNITED STATES.**

**KIRBY v. UNITED STATES.**

**MacWILLIAMS v. UNITED STATES.**
(two cases).

**TRENT v. UNITED STATES.**

**BRADY v. UNITED STATES.**
Nos. 11353–11361, 11363, 11364.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 6, 1953.

Decided July 2, 1953.

Writ of Certiorari Denied
Oct. 12, 1953.

See 74 S.Ct. 48.

506

David F. Smith, Washington, D. C., with whom T. Edward O'Connell, Washington, D. C., was on the brief, for appellants in Nos. 11353 to 11357 and 11364.

Charles E. Ford and H. Clifford Allder, Washington, D. C., on the brief for appellants in Nos. 11358 and 11359.

Edward Bennett Williams, Washington, D. C., with whom Murdaugh Stuart Madden, Falls Church, Va., on the brief, for appellants in Nos. 11360, 11361 and 11363. Francis P. Noonan, Washington, D. C., entered his appearance for appellant in No. 11363.

William E. Kirk, Jr., Asst. U. S. Atty., at time of argument, Washington, D. C., with whom Charles M. Irelan, U. S. Atty., at time of argument, Washington, D. C., John W. Fihelly, Thomas A. Wadden, and Alfred L. Hantman, Asst. U. S. Attys.,

Washington, D. C., were on the brief, for appellee. Joseph M. Howard, Asst. U. S. Atty., when brief was filed, Washington, D. C., was also on the brief, for appellee. William R. Glendon, Asst. U. S. Atty., at time of argument, Washington, D. C., entered an appearance on behalf of the appellee.

Before EDGERTON, PRETTYMAN and BAZELON, Circuit Judges.

BAZELON, Circuit Judge.

All the appellants were jointly tried and convicted under District of Columbia lottery laws for conducting a large "numbers" operation controlled by one of them, Charles E. Nelson.[1] Seventy highly incriminating papers belonging to Nelson were admitted in evidence as Government exhibits, over his objection that they were obtained from him in an illegal search and seizure[2] by the Senate's Special Committee to Investigate Crime in Interstate Commerce.[3] At the hearing on Nelson's motion to return these papers and suppress them in evidence, the main thrust of his counsel's argument was that as a matter of law he had not voluntarily surrendered the papers to the Committee.[4] The trial court, in

---

[1.] Charles E. Nelson and fifteen others, of whom eleven are appellants here, were charged with (1) the operation and promotion of a lottery known as a numbers game in violation of 22 D.C.Code § 1501 (1951), and (2) a conspiracy, under 62 Stat. 701 (1948), 18 U.S.C. § 371, to violate that statute. Five of the eleven appellants, including Nelson, were convicted on both counts, the others on count one only.

[2.] The Fourth Amendment reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[3.] Sen.Res. 202, 81st Cong., 2d Sess. (1950).

[4.] In Nelson's motion to suppress and return, he charged violation of Fourth and

Fifth Amendment rights. At the hearing on the motion, after noting that though "at first blush" it would seem "that Nelson voluntarily turned these records over to the Senate Committee," counsel said:

"I call Your Honor's attention to the factual situation surrounding the turning over of those records, and will argue from that, with a number of adjudicated cases, that what seems to be, on the face of the record, a voluntary turning over was not voluntary, as a matter of law; and, if that is so, then they were not there lawfully. * * *

"Your Honor will observe, in the reading of Mr. Nelson's testimony before the Investigating Committee on August 9 of this year,—and it takes up some 95 pages of the record,—that he was subpoenaed before that Committee. He did not have counsel and he was never advised of his constitutional rights. He was there before this Committee, which was asking him many, many questions, all designed, obviously, to be of an ac-

denying the motion, held on the merits that Nelson "voluntarily turned over" these papers to the Committee. This issue, briefed and argued on Nelson's behalf in this court, is therefore clearly before us for decision.[5] Since we think Nelson must prevail on this issue, we need not reach consideration of the contention stressed in his motion and supporting affidavit that the Committee illegally turned over his papers to the United States Attorney in the face of a Committee promise to return them to him "at the very earliest date, so as not to inconvenience [him] any."[6]

■ ■ If, as his counsel contended, Nelson's action in turning over his papers to the Committee "was not voluntary as a matter of law," the papers were the fruit of an illegal search and seizure and hence inadmissible in evidence.[7] Cri-

---

cusatory nature indicating that he was guilty of a number of crimes.

"When we come to this question of these records, page 2135 of the stenographic record which has been offered in evidence,—and this is presented to Your Honor on the theory of what I will call, for the need of a better term at the moment, as delineated by these cases which I will present to Your Honor in a few moments,—this evidence I am reading to Your Honor is a predicate for showing that, because of the atmosphere in which Mr. Nelson was testifying, the situation in which he found himself, there was at least moral coercion.

" * * * So, I say here, in attempting to apply these cases on a consent not being a real consent, that it is clear to me that this man [Nelson] was under the coercion of the very impressive authority of the Senate Committee when he turned these papers over. * * *

"I submit, Your Honor, the worst that could be said is that Mr. Nelson, if he did turn them over voluntarily, and I, of course, do not admit that he did, but if he did, he turned them over for a specific purpose to be used by the Committee, and they said, 'We will give them back to you at the earliest date so as not to inconvenience you.' "

5. Stein v. United States, 9 Cir., 1948, 166 F.2d 851, 855, certiorari denied, 1948, 334 U.S. 844, 68 S.Ct. 1512, 92 L.Ed. 1768; United States v. DiRe, 2 Cir., 1947, 159 F.2d 818, 820, affirmed, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210.

6. Nelson's affidavit stated broadly, "That the manner by which said United States Attorney secured possession of said property constitutes an illegal search and seizure in violation of the Fourth Amendment of the Constitution and the retention or use thereof infringes upon the privileges against incrimination as guaranteed by the Fifth Amendment of the Federal Constitution." We note that the cases relied upon by the Government to meet that argument merely il-

lustrate the familiar rule that "the criterion of immunity [is] not the ownership of property but the 'physical or moral compulsion' exerted" by federal officials in obtaining its possession. Perlman v. United States, 1918, 247 U.S. 7, 15, 38 S.Ct. 417, 62 L.Ed. 950. The cited cases, in which Fourth or Fifth Amendment rights were held not violated, involved disputed evidence obtained by the prosecution from such third parties as (1) receivers in whose custody it rested by operation of the bankruptcy laws, Ex parte Fuller, 1923, 262 U.S. 91, 43 S. Ct. 496, 67 L.Ed. 881; Johnson v. United States, 1913, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919; (2) a federal court, Perlman v. United States, supra, or administrative agency, Schauble v. United States, 8 Cir., 1930, 40 F.2d 363, where it had been voluntarily introduced in proceedings by a complaining owner; (3) state officials who obtained it either entirely through their own efforts, Fuller v. United States, 2 Cir., 1929, 31 F.2d 747, certiorari denied, 1929, 280 U.S. 556, 50 S.Ct. 17, 74 L.Ed. 612, or as a result of its being filed as a public record, Davis v. United States, 5 Cir., 1943, 138 F.2d 406, certiorari denied, 1944, 321 U.S. 775, 64 S.Ct. 616, 88 L.Ed. 1069; and (4) a federal prison official who obtained it pursuant to "established practice, reasonably designed to promote the discipline of the institution," and not as a result of "threat or coercion," Stroud v. United States, 1919, 251 U.S. 15, 21, 40 S.Ct. 50, 53, 64 L.Ed. 103. The third parties in each case were either state officials who obtained evidence without the collusive efforts of federal officials, or federal officials who, unlike those here, obtained the evidence by operation of law or without the exertion of "physical or moral coercion."

7. McDonald v. United States, 1948, 335 U.S. 451, 453, 69 S.Ct. 191, 93 L.Ed. 153; Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652. For an excellent discussion of the admissibil-

teria for determining this issue were stated by Judge Washington, speaking for this court, in Judd v. United States.[8] While Judd was under arrest, he was asked whether " 'he minded [the police] going over to his room and taking a look, and he said no. * * * He said he had nothing to conceal or hide out there, and it was perfectly all right for [them] to go out there.' "[9] In excluding evidence seized in a search pursuant to such assent, we said:

"Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. [1] The Government must show a consent that is 'unequivocal and specific' [2], 'freely and intelligently given.' [3] Thus 'invitations' to enter one's house, extended to armed officers of the law who demand entrance, are usually to be considered as invitations secured by force. [4] A like view has been taken where an officer displays his badge and declares that he has come to make a search [5], even where the householder replies 'All right.' [6] A finding of consent in such circumstances has been held to be 'unfounded in reason'. [7] Intimidation and duress are almost necessarily implicit in such situations; if the Government alleges their absence, it has the burden of convincing the court that they are in fact absent.

"This burden on the Government is particularly heavy in cases where the individual is under arrest. Non-resistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found. [8] In fact, the circumstances of the defendant's plight may be such as to make any claim of actual consent 'not in accordance with human experience', and explainable only on the basis of 'physical or moral compulsion'. [9]"[10]

"[1] Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; United States v. Kelih, D.C.S.D.Ill. 1921, 272 F. 484.

"[2] Karwicki v. United States, 4 Cir., 55 F.2d 225, 226.

"[3] Kovach v. United States, 6 Cir., 53 F.2d 639.

"[4] United States v. Marquette, D.C.N.D.Cal.1920, 271 F. 120.

"[5] United States v. Slusser, D. C.S.D.Ohio 1921, 270 F. 818.

"[6] United States v. Marra, D. C.W.D.N.Y.1930, 40 F.2d 271.

"[7] Herter v. United States, 9 Cir., 27 F.2d 521.

"[8] United States v. Novero, D.C., 58 F.Supp. 275; United States v. McCunn, D.C.S.D.N.Y.1930, 40 F. 2d 295.

"[9] Ray v. United States, 5 Cir., 84 F.2d 654, 656."

 It is clear from Judd and the many cases discussed therein that consent, like "The fairness of a trial must be determined by appraisal of the whole rather than by picking and choosing among its component parts."[11] Only in that way can we ascertain whether con-

---

ity of illegally obtained evidence, see Comment, Judicial Control of Illegal Search and Seizure, 58 Yale L.J. 144–164 (1948). See text infra.

8. 1951, 89 U.S.App.D.C. 64, 190 F.2d 649.

9. 89 U.S.App.D.C. at page 65, 190 F.2d at page 650.

10. 89 U.S.App.D.C. at pages 65–66, 190 F.2d at pages 650–651.

11. Burns v. Lovett, 1952, 91 U.S.App.D.C. 208, 221, 202 F.2d 335, 348 (dissenting opinion), affirmed, Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045.

sent is voluntary, *i. e.,* given "freely and intelligently," [12] without "physical or moral compulsion." [13] Essential to that appraisal here is an evaluation of the influences at work upon Nelson when he turned over his papers. Those influences sprang from the circumstances of a day-long interrogation of Nelson by the Senate Committee.

Nelson appeared before the Committee under compulsion of a subpoena served upon him the preceding afternoon.[14] He appeared without counsel. Committee spokesmen neither advised him that he might have counsel nor that he had a constitutional right not to incriminate himself.[15] Question after question was directed at his illegal gambling activities in the District of Columbia. His evasive responses were first met by voluble expressions of dissatisfaction. But before the Committee obtained his assent to let it *see* a personal account book, it had characterized his conduct as "very dark and very suspicious," "very incriminating," and the following had occurred:

"Mr. Rice [Committee counsel]. Frankly, I think his attitude is contemptuous, Senator, and I think he should be at least instructed that the law is to the effect that if a witness knows the answer to the question he can be cited for contempt or perjury just the same as if he refuses to answer if he knows the answer and says he does not know. Do you understand that?
* * *

"The Chairman. You are the only one that can clear it up, and now is your chance, because the committee is not—this is not going to be laughed off with the committee. We are going to the bottom of it, and we

are going to bring it to the authorities, and those who are guilty are going to be prosecuted, and if you are one of them, you are going to be in it.

"Now if you are not one of them, now is the time to make it clear, and so far you have not made it clear.

"We are going to take a recess shortly and I simply suggest that you think over carefully and come back when you resume the stand prepared to tell us the truth. Now is your chance, and it is up to you entirely. Do you understand what I say?

"Mr. Nelson. I get the general drift. You don't feel like I am doing what I can.

"The Chairman. No, I do not.

"Mr. Nelson. Believe me, I have never been in this poolroom that he mentions that I can remember.

"The Chairman. I am talking about the whole picture, what we understand is a $6 million operation, from which you have received hundred thousand dollars. Now you are not going to make us believe that you are as ignorant as you appear to be. Now you, therefore, have the chance to come back this afternoon and tell us the truth if you want to, and if you don't clear it up, you have nobody to blame but yourself if you are involved in some prosecution later.

"Mr. Nelson. I have told the truth.

"The Chairman. Do you understand what I said?

"Mr. Nelson. I take it—

12. Kovach v. United States, 6 Cir., 1931, 53 F.2d 639.

13. Perlman v. United States, supra, 247 U.S. at page 15, 38 S.Ct. 420.

14. As to the compulsory nature of a subpoena, see United States v. Fleischman, 1950, 339 U.S. 349, 365, 70 S.Ct. 739, 94 L.Ed. 906, and United States v. Monia, 1943, 317 U.S. 424, 429, 63 S.Ct. 409, 87 L.Ed. 376.

15. The Fifth Amendment reads: "No person shall be * * * compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law * * *."

"The Chairman. Do you understand it?

"Mr. Nelson. Do you want me to come back this evening, is that what you want me to do, and talk further?

"The Chairman. I want you to think it over during the lunch recess, think it over—

"Mr. Nelson. Yes.

"The Chairman. (continuing)—and come back prepared to tell us the truth, which so far you have not done.

"Mr. Nelson. I beg your pardon, sir. I have really tried, and have told you the truth.

"The Chairman. That is my opinion.

"Mr. Nelson. I can understand how you may feel that way.

"The Chairman. And you haven't cleared the matter up at all so far. You have the chance.

"Mr. Nelson. What did you want to clear up, sir?

"The Chairman. This whole matter about the different operations which run up to considerable amounts, and from which you have gotten a lot of money, and which you have benefited from, and you cannot make us believe that you don't know what kind of business operations they were.

"Mr. Nelson. I have told you everything that I—

"Senator Kefauver. The committee will meet this afternoon—."

Thus the hearing recessed with echoes of the threats of prosecution. Apparently they had an immediate effect. Following the noon recess, Nelson was almost loquacious in supplying information of an incriminating nature in response to questions patently designed to elicit it.[16] These questions concerned his financial dealings, bank accounts, tax returns and particularly his part in backing a numbers syndicate with Mr. and Mrs. Nowland, who are also appellants here.

Very shortly after his return, he was asked about his account book—specifically a "little red book." In reply to the question, "And if we were to suggest that a staff member might like to accompany you out to the little red book, can he *see* it?", he said, "It would be all right with me."

At the close of the hearing this request to *see* the "little red book" had become a direction to *turn over* the book. At that point the Acting Chairman said:

"Senator Hunt [Acting Chairman]. Mr. Nelson, we will have a staff member accompany you out to your home and if you will turn over to him your account book, the little red book you spoke of, he will see that you get a receipt for it and the committee will return it to you at the very earliest date, so as not to inconvenience you any.

"You are now excused, Mr. Nelson.

"Mr. Nelson. I am afraid *I do not understand what it is you want me to do.*

"Senator Hunt. Well, *we will have a member of the staff*—you tell me if you are not hearing—*go with you out to your home and you turn over to him* a statement of your net worth together with *your little account book* that you spoke of as the little red book, where you keep your 'ins' and 'outs', as you said. *In addition to that, the subpoena that you are now testifying under will hold until such time as the committee releases the subpoena.*

"Now, is there anything you do not understand?

"Mr. Nelson. You expect me to to send a statement of the net worth back tonight?

16. During trial, the court ruled that Nelson's oral testimony before the Committee was inadmissible in evidence. The court apparently acted under 18 U.S.C. § 3486, see text and note 35, infra.

512

"Senator Hunt. Not necessarily, but we would like it just as soon as you can have it prepared. *We do want, however, the little red book you spoke of,* your 'ins' and 'outs'.

"That is all, Mr. Nelson."[17]

A "member of the staff," one Thomas Spence Smith, a Maryland policeman assigned to the Committee, immediately accompanied Nelson to his home in Maryland. Upon entering, Smith asked for the 1951 little red book. Nelson said "it was not all together as yet" but pulled out a bottom drawer filled with other papers, envelopes and books. Smith examined one of the books and discovered that it was a 1942 ledger concerning lotteries and numbers operations. He asked Nelson "if we might have the whole file and [Nelson] said he would be glad to let me have anything I would like to have." Although they were not the papers demanded by the Committee, Smith nevertheless took them. Nelson drove him back to the District of Columbia in his car, where they parted. Smith went directly to the office of the Senate Committee. Eight days later, the Committee turned these papers over to the United States Attorney who had "shown a great deal of interest in this case * * and had an able assistant" present at Committee hearings.[18] These papers became the seventy Government exhibits admitted in evidence at the trial under review.

Nelson's freedom of choice had been dissolved in a brooding omnipresence of compulsion. The Committee threatened prosecution for contempt if he refused to answer, for perjury if he lied, and for gambling activities if he told the truth. Then, with a warning that he was still under subpoena, it directed him to lead a policeman to his home and there turn over the "little red book" which it promised to return "at the very earliest date, so as not to inconvenience [him] any." Finally, when the policeman entered Nelson's home and learned that the "little red book" was not available, he examined and took other papers and documents not demanded by the Committee. At no time did the Committee or its staff inform Nelson that he would be allowed counsel or that he had a right to refuse to testify or to produce personal papers with regard to self-incriminating matters.[19] His home was invaded, his files searched, and his papers seized, all without process of any kind. The fact that the Committee was empowered to obtain materials by subpoena duces tecum is irrelevant because (1) no subpoena duces tecum was issued, and (2) even if the Committee's informal action be accepted as a substitute for a subpoena, it demanded only the "little red book" and not the papers that were seized.[20] The Government does not suggest that there was no search and seizure. It merely relies on Nelson's as-

17. Emphasis supplied.

18. Three days later, "a Grand Jury subpoena as a receipt was served on the Chairman of the subcommittee for the Nelson records."

19. See Wood v. United States, 1942, 75 U.S.App.D.C. 274, 287, 128 F.2d 265, 278, 141 A.L.R. 1318, where Mr. Justice Rutledge (then a member of this court) said that a preliminary hearing without such safeguards would be "a trap and an inquisition, with consequences for the accused and for the judicial system not tolerable under the Constitution." Had Nelson been advised of his constitutional rights or that he was entitled to counsel, we might have a different case. But none of these guides to the exercise of free will were furnished him or called to his attention.

20. We do not of course decide whether even the "little red book" could have been reached, over objection, by a subpoena duces tecum.

The subpoena that Nelson was under, like a subpoena duces tecum, could not do service for a search warrant. United States v. Blumberg, D.C.1941, 38 F.Supp. 1018. We need not decide whether such papers would be within reach of a search warrant properly issued. But we do note that the Committee's governing resolution does not expressly empower it to issue or obtain search warrants. Sen.Res. 202, 81st Cong., 2d Sess. § 3 (1950). And our limited research has not disclosed an instance where Congress has exercised or even claimed such power for itself.

sent to say that it was not unreasonable. To find that this assent was "freely and intelligently given" [21] would be "not in accordance with human experience." [22] We cannot escape the conclusion that his acquiescence in the search and seizure is "explainable only on the basis of 'physical or moral compulsion.' " [23]

Judd and the cases it follows make clear that if Nelson had been subjected to the same day-long pressures in a police station or a district attorney's office, his assent would not have been voluntary as a matter of law. It would have been futile for the Government to contend that he voluntarily agreed to lead a policeman into his home and voluntarily gave him carte blanche to look for incriminating papers and take them, or to contend that the looking and taking were not a search and seizure. If there is anything to suggest that a congressional committee hearing is less awesome than a police station or a district attorney's office, and should therefore be viewed differently, it has escaped our notice. The similarity has become more apparent as the "investigative" activities of Congress have become less distinguishable from the law enforcement activities of the Executive. "[W]e would have to be that 'blind' Court, * * * that does not see what '(a)ll others can see and understand' not to know that there is wide concern, both in and out of Congress, over some aspects of the exercise of the congressional power of investigation." [24]

Though a court can no more enjoin a congressional committee from making an unconstitutional search and seizure that it can enjoin Congress from passing an unconstitutional bill,[25] a court does have the power and duty to deny legal effect to either in an action before it. The Fourth Amendment exempts no branch of the federal Government from the commandment that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." This constitutional guaranty applies with equal force to executive, legislative, and judicial action.[26] Courts and committees rightly require answers to questions. But neither may exert this power to extort assent to invasions of homes and to seizures of private papers. Assent so extorted is no substitute for lawful process.

Nelson's long-time gambling activities and earlier brushes with the law are no excuse for relaxing constitutional safeguards. We reject the argument that he was so sophisticated and hardened that he could withstand the pressures put upon him by the Committee and that his failure to assert constitutional rights was not due to ignorance but was intended as a waiver.[27] Such speculation does not measure up to judicial standards. "Rights intended to protect all must be extended to all, lest they so fall into desuetude in the course of denying them to the worst of men

21. Kovach v. United States, 6 Cir., 1931, 53 F.2d 639.

22. Ray v. United States, 5 Cir., 1936, 84 F.2d 654, 656.

23. Judd v. United States, supra. And see United States v. Guerrina, D.C.E.D.Pa., 112 F.Supp. 126.

24. United States v. Rumely, 1953, 345 U. S. 41, 44, 73 S.Ct. 543, 545.

25. Hearst v. Black, 1936, 66 App.D.C. 313, 87 F.2d 68.

26. See discussion in McGeary, Congressional Investigations: Historical Development, 18 Chi.L.Rev. 425, 434 (1951); and see Lasson, The History and Development of the Fourth Amendment to the United States Constitution 101 et seq. (1937).

27. "There is no more basis for such a presumption than for one that a defendant understands the rules governing the sufficiency of indictments, the admissibility of evidence, and the burden of proof, or other rules of substantive and adjective law * * *." Evans v. Rives, 1942, 75 U.S.App.D.C. 242, 248, 126 F.2d 633, 639. And see Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.

as to afford no aid to the best of men in time of need." [28]

It follows that Nelson's motion to return and suppress the exhibits should have been granted. There are strong indications in the record that a considerable part of other evidence introduced against him may have resulted directly from the Government's use of the illegally seized papers.[29] Such evidence was also inadmissible.[30] Since we cannot say from the record of more than two thousand pages that the jury would have convicted Nelson had all this evidence not been adduced, his conviction must be reversed and his case remanded for a new trial.[31]

## II

The denial of Nelson's motion to suppress was, as the Supreme Court said of an illegal seizure from an appellant in McDonald v. United States, "error that was prejudicial to [the other appellants] as well." [32] "If the property had been returned * * * it would not have been available * * * at the trial," where its use infected the cases of the other appellants since all were tried jointly. The court did not, and as a practical matter could not, limit the jury's consideration of the unlawfully seized evidence to Nelson alone. Moreover, we think it "unjust and illogical to separate [these] cases" [33] by reversing the judgment against the one charged with controlling the illegal enterprise and affirming the judgments against those who did his bidding. The convictions of all the appellants are set aside and their cases remanded for new trial.[34]

28. Goldman v. United States, 1942, 316 U.S. 129, 142, 62 S.Ct. 993, 999, 86 L.Ed. 1322 (dissenting opinion).

29. Record, pp. 994–1012.

30. Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319. There Mr. Justice Holmes, speaking for the Court, said: "The proposition * * * is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U.S. 393, 34 S.Ct. 341. *The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.* Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an in-

dependent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." Emphasis supplied.

31. See Braswell v. United States, 5 Cir., 1952, 200 F.2d 597, 602, where the court said: "The right to trial by jury comprehends a fair determination of the guilt or innocence of the accused, free from bias, passion or prejudice. See United States v. Haupt, 7 Cir., 136 F.2d 661. And where error occurs which, within the range of a reasonable possibility, may have affected the verdict of a jury, appellant is not required to explore the minds of the jurors in an effort to prove that it did in fact influence their verdict. See Little v. United States, 10 Cir., 73 F.2d 861, 866, 96 A.L.R. 889; Cf. Kotteakos v. United States, 328 U.S. 750, 763–765, 66 S.Ct. 1239, 90 L.Ed. 1557."

32. 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. And see McKnight v. United States, 1950, 87 U.S.App.D.C. 151, 153, 183 F.2d 977, 979.

33. United States v. Thomson, 7 Cir., 1940, 113 F.2d 643, 646, 129 A.L.R. 1291.

34. See Anderson v. United States, 1943, 318 U.S. 350, 356–357, 63 S.Ct. 599, 602, 87 L.Ed. 829. There illegally obtained confessions of some co-defendants were admitted in evidence without mention of the names of other co-defendants implicated therein and with an admonition to the jury that the confessions were " 'only

### III

Since the violation of Nelson's constitutional rights requires not only that the disputed material shall not "be used as evidence in any criminal proceeding against him in any court," as provided by § 3486 of Title 18 U.S.C.,[35] but "that it shall not be used at all," [36] we need not consider the limited protection [37] that § 3486 gives.

### IV

A procedural question first raised by this court is whether the doctrine of *res judicata* bars our review of Nelson's attack upon the Government's possession of his papers. Clearly the Government thought not. It did not mention the subject in this court, but undertook to meet Nelson's constitutional contentions on their merits. It urged *res judicata* only after our own examination of the record caused us to invite counsel to express their views on the matter.[38] We need not decide whether the Government's course was a waiver [39] or concession, since we think *res judicata* does not apply.

 Nelson filed his motion to suppress on September 7, 1951, prior to any indictment. It sought the return of his papers and their suppression as evidence both in grand jury proceedings then pending and on the trial of any indictment that might be returned.[40] On October 10, 1951, the grand jury returned an indictment in Criminal No. 1441–51 (not involved here), charging Nelson with perjury before the Senate Committee. The critical order of October 16, 1951, denying the motion to suppress,[41] *followed* the perjury indictment by six days but *preceded* by six days the same grand jury's present lottery indictment.[42] This order was entered in the docket of the then pending perjury case and entitled: "In re Charles E. Nelson, et al.: * * * Criminal No. 1441–51." It recited "that the property sought was voluntarily turned over by" Nelson to the Senate Committee.

During the lottery trial under review, counsel attempted to raise the constitutional objections to the admission of Nelson's papers. The court ruled that the October 16 order was *res judicata*. The court indicated that it would "not stop in the midst of the trial to hear those matters" if "the judge has *preliminarily* ruled" that, in producing the papers "no constitutional rights were invaded." At the end of the trial, and

---

to be used against the persons who made them.'" Nevertheless the Supreme Court held that the jury was not bound to such a restricted use and "had every right to assume that in ascertaining the guilt or innocence of each defendant they could consider the whole proof made at the trial. There is no reason to believe, therefore, that confessions which came before the jury as an organic tissue of proof can be severed and given distributive significance by holding that they had a major share in the conviction of some of the petitioners and none at all as to the others. Since it was error to admit these confessions, we see no escape from the conclusion that the convictions of all the petitioners must be set aside."

35. Section 3486 provides in pertinent part: "No testimony given by a witness * * * before any committee of either House * * * shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony."

36. See note 30, supra.

37. United States v. Bryan, 1950, 339 U.S. 323, 335–337, 70 S.Ct. 724, 94 L.Ed. 884. And see Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, construing another statute identical in all material respects.

38. On March 25, 1953, we directed the parties to file memoranda addressed to the problem of *res judicata*.

39. Compare Jesionowski v. Boston & Maine R. Co., 1947, 329 U.S. 452, 458–459, 67 S.Ct. 401, 91 L.Ed. 416.

40. See text and note 4, supra.

41. On September 28, 1951, the court issued a memorandum opinion denying the motion.

42. On October 22, 1951, the grand jury returned the second indictment, note 1, supra.

without Government opposition, the court ordered that all papers filed, and the transcript of proceedings in connection with the motion to suppress, "found in Criminal No. 1441–51, United States v. Charles E. Nelson [the perjury case] (Grand Jury No. 1398–51), be incorporated in the record on" this appeal.[43] In these circumstances we think the order of October 16 was interlocutory, not final and independently appealable, and hence not *res judicata*.[44]

■ Ordinarily the time of filing a motion to suppress and of entering an order thereon provides a yardstick for determining the appealability of the order. If the motion is filed and the order entered before indictment, the order is usually final and thus independently appealable;[45] if the motion is filed and the order entered after indictment, the order is usually interlocutory and hence reviewable upon appeal from a judgment of conviction.[46] This yardstick does not provide a ready answer here because the instant order, although based upon a motion filed before either indictment, was entered after the perjury indictment. In some circuits orders entered after indictment, on motions made before indictment, have been held final and independently appealable.[47] But we held such an order interlocutory in United States v. Mattingly.[48] We follow that

---

**43.** The following matter was incorporated in the record:

"1. Motion and affidavit of Charles E. Nelson for the return of property and the suppression of evidence.

"2. Opposition to the motion for return of property, etc., and the affidavits of Thomas Spence Smith and George Morris Fay in support thereof.

"3. Orders of September 28, 1951, and October 16, 1951, denying the motion for return of property, etc.

"4. Transcript of the proceedings had on the motion for the return of property and the suppression of evidence."

**44.** United States v. Wallace & Tierman Co., 1949, 336 U.S. 793, 69 S.Ct. 824, 93 L.Ed. 1042.

**45.** Burdeau v. McDowell, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, and note 53, infra; Perlman v. United States, 1918, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950; In re Milburne, 2 Cir., 1935, 77 F.2d 310. And see United States v. Bianco, 3 Cir., 1951, 189 F.2d 716; United States v. Rosenwasser, 9 Cir., 1944, 145 F.2d 1015, 156 A.L.R. 1200, 1209–1213; Wai v. United States, 2 Cir., 1942, 125 F.2d 915.

**46.** Cogen v. United States, 1929, 278 U.S. 221, 226, 49 S.Ct. 118, 120, 73 L.Ed. 275. But the Court noted: "the independent character of a summary proceeding for return of papers may be so clear, that it will be deemed separate and distinct, even if a criminal prosecution against the movant is pending in the same court. This was true in Essgee Co. v. United States, 262 U.S. 151, [43 S.Ct. 514, 67 L.Ed. 917] where the petition was entitled as a separate matter and was referred to by the court as a special proceeding." An

order on a motion by a stranger to a pending criminal action is equitable in character and final. Go-Bart Importing Co. v. United States, 1931, 282 U.S. 344, 356, 51 S.Ct. 153, 158, 75 L.Ed. 374. There the Court said: "It follows that the order of the district court was not made in or dependent upon any *case* or *proceeding* there pending and therefore the order as to them was appealable." [Emphasis supplied.] And see United States v. Cefaratti, 1952, 91 U.S.App.D.C. 297, 202 F.2d 13, certiorari denied, 1953, 345 U.S. 907, 73 S.Ct. 646, where this court held final and appealable an order *granting* a motion filed pending a criminal action. The trial court, on the Government's request, had dismissed the indictment counts which rested upon the suppressed evidence. No indictment, therefore, was pending at the time of appeal and hence all proceedings were at a standstill except via an appeal from the order granting the motion. We noted, however, "that if the District Court had *refused* [as here] to suppress the evidence its order would not have been final and therefore would not have been appealable." 202 F.2d at page 17.

**47.** United States v. Poller, 2 Cir., 1930, 43 F.2d 911, 74 A.L.R. 1382; In re Sana Laboratories, 3 Cir., 1940, 115 F.2d 717, certiorari denied, 1941, 312 U.S. 688, 61 S.Ct. 615, 85 L.Ed. 1125; and see Weldon v. United States, 9 Cir., 1952, 196 F.2d 874, 875.

**48.** 1922, 52 App.D.C. 188, 285 F. 922. After Steele v. United States No. 2, 1924, 267 U.S. 505, 45 S.Ct. 417, 69 L.Ed. 761, see note 54, infra, Mattingly was cited with approval by the Supreme Court as illustrating an interlocutory order. Cogen v.

view, not simply because it was adopted here a number of years ago but more importantly because it serves the strong policy against piecemeal appeals.

■ ■ Generally, if there is an effective vehicle for review without immediate appeal from a ruling of a trial court, appellate courts withhold review until the conclusion of the entire controversy. "The purpose of [this] rule of finality is to prevent interrupted trials and piecemeal appeals." [49] "These considerations of policy are especially compelling in the administration of criminal justice. * * * An accused is entitled to scrupulous observance of constitutional safeguards. But encouragement of delay is fatal to the vindication of the criminal law. Bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship. The correctness of a trial court's rejection even of a constitutional claim made by the accused in the process of prosecution must await his conviction

before its reconsideration by an appellate tribunal." [50]

Although this rule of finality is not inflexible,[51] we are aware of no overriding policy, and none has been called to our attention, for upsetting it here. Quite evidently, counsel for Nelson proceeded on the assumption that the order overruling his motion to suppress, entered in the then pending perjury prosecution, was interlocutory, and reviewable only if conviction resulted. We think counsel was right. Under the Mattingly case,[52] the order was interlocutory and unappealable when it was entered.[53] The bringing of a second indictment later could not retroactively transform it into an order that could be and must be promptly appealed. A rule permitting such a transformation would entrap not only unwary defendants but every defendant within reach of the rule. Accordingly the doctrine of *res judicata* has no application here.[54]

Reversed and remanded for new trial.

United States, 1929, 278 U.S. 221, 227, note 7, 49 S.Ct. 118, 73 L.Ed. 275. Recently this court, relying upon Cogen, in United States v. Cefaratti, 1952, 91 U.S. App.D.C. at 301, note 5, 202 F.2d at page 16, note 5, impliedly affirmed this view when it noted, "After indictment and before trial, an order *denying* [as here] a defendant's motion to suppress is not final and not appealable.

49. Id. 202 F.2d at page 17.

50. Cobbledick v. United States, 1940, 309 U.S. 323, 325–326, 60 S.Ct. 540, 541, 84 L.Ed. 783, citing Cogen v. United States, supra, with approval. And see Swift & Co. Packers v. Compania Caribe, 1950, 339 U.S. 684, 688–689, 70 S.Ct. 861, 94 L.Ed. 1206; Cohen v. Beneficial Indus. Loan Corp., 1948, 337 U.S. 541, 545–546, 69 S.Ct. 1221, 93 L.Ed. 1528.

51. United States v. Cefaratti, supra.

52. See note 48, supra.

53. If Nelson's motion had been granted or the grand jury proceedings stayed pending appeal, the order may well have been final. See Cobbledick v. United States, supra, note 50, 309 U.S. at page 329, note 6, 60 S.Ct. 543, where the Court, referring to Burdeau v. McDowell, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, said:

"In that case proceedings were commenced in the district court for the recovery of documents held by the Government for use before a grand jury. The district court granted the relief sought, and the Government appealed. In this Court the action of the district court was treated as final, and hence subject to review. *But the practical considerations there involved were entirely different from those which must govern here. In* Burdeau v. McDowell *the action of the district court was itself an interruption of the grand jury's inquiry; appeal by the Government did not halt the 'orderly progress' of the inquiry.*" [Emphasis supplied.] And see Nardone v. United States, 1939, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307.

54. Steele v. United States No. 2, 1925, 267 U.S. 505, 45 S.Ct. 417, 69 L.Ed. 761, is not applicable. There the Court held an order refusing to vacate a search warrant and to return seized liquor *final* and *res judicata* as to issues not previously raised in a proceeding brought under the National Prohibition Act, 41 Stat. 305, 315 (1919). The Act provided, by reference to Title XI of the Espionage Act of June 15, 1917, 40 Stat. 217, 228, "an independent proceeding, for the vacation of a warrant wrongfully issued and for

**518**

PRETTYMAN, Circuit Judge (dissenting).

## I

I do not find any search or seizure in the facts of this case.

What I find in the record is the following: A Senate Committee was investigating interstate crime. It not only had the power but also had a duty to do so. Charles E. Nelson was a witness duly subpoenaed and sworn. He was questioned about the activities of several concerns, principally one known as Robert Nowland Associates, it later developing that the Committee had information that he had received some $180,000 from this concern in four years. The witness repeatedly asserted his sincere purpose to cooperate with the Committee. He volunteered the suggestion that his books were a more accurate evidence of figures inquired about, and later he was rather insistent to that effect. He readily concurred in the suggestion that he go fetch the books, which he said were at home. This witness was obviously either deaf, extremely nervous, or stalling. He was warned several times in language similar to that which a trial judge ordinarily directs to a recalcitrant witness. Once in the middle of the hearing and again at the end of it he was asked whether a member of the staff could go with him to get a then-current 1951 book. He readily agreed, drove the official to his home, got out the records now the subject of this dispute, gave them to the official, and drove him back to the Capitol.

At no point did Nelson offer any objection either to pertinency or of privilege.

Clear understanding requires a little more specific statement of the facts than the foregoing summary. Nelson parried questions. He was warned that he was a witness and must tell the truth. He repeatedly insisted that he was trying to do so, to cooperate. He was reminded that his income tax return for 1948 showed $49,936 as receipts from Nowland Associates. Asked where he "put down" what he received, Nelson said he listed it in a book. He was asked where the book was and replied, "They are kept in separate years, and I don't know—I will try to locate them for you, if it will be of any help." I interject that this is the critical point in all that followed. This was a clear, unsolicited offer by the witness to locate and furnish more specific, more accurate information. Nelson repeatedly denied that he knew certain facts about Nowland and constantly asserted his wish to tell whatever he knew; for example, "Believe me, as much as I would like to, I can not. I would love to, if I really

return of the property." Cogen v. United States, 1929, 278 U.S. 221, 226, 49 S.Ct. 118, 120, 73 L.Ed. 275. In that proceeding a search warrant was challengeable before a judge or commissioner, and testimony had to be taken, reduced to writing and subscribed by each witness. Only then could an order be issued disposing of property. It was such an order that the Supreme Court reviewed in Steele v. United States No. 1, 1925, 267 U.S. 498, 501, 45 S.Ct. 414, 69 L.Ed. 757, as final and independently appealable. After conviction upon trial petitioner sought review in Steele No. 2 of an issue, relating to the validity of the search warrant, which had not been raised in the special proceeding provided by the National Prohibition Act. It was in that context that the Supreme Court held, in Steele No. 2, that the order emanating from the special proceeding, and reviewed in Steele No. 1, was final and appealable and hence res judicata.

Here no such independent proceeding was provided in the Senate Committee's enabling resolution. Nor had any search warrant been issued—no doubt because that resolution does not expressly give the Committee such authority. See note 20, supra. And in Cogen v. United States, supra, 278 U.S. at page 226, 49 S.Ct. 120, the Court narrowed the scope of Steele No. 2 even as to orders arising out of the separate proceedings provided in the National Prohibition Act. The Court declared that motions for the return of property under that Act "may be independent proceedings, but are not necessarily so." Steele No. 2 then does not make an order such as the one here final and res judicata nor does it provide a basis for determining the nature of that order.

knew the facts—I would tell you in a minute." He was asked what he had received from Nowland in the then-current year, 1951. He replied "I do not have any idea right now" and "I have to go back to whatever records we keep." Asked where the records were, he said they were at home. Then the following occurred:

"Mr. Rice. And if we were to suggest that a staff member might like to accompany you out to the little red book, can he see that?

"Mr. Nelson. It would be all right with me."

After a long interrogation, during which Nelson repeatedly made reference to the necessity for looking at books (bank books, etc.), the presiding Senator said:

"Senator Hunt. Mr. Nelson, we will have a staff member accompany you out to your home and if you will turn over to him your account book, the little red book you spoke of, he will see that you get a receipt for it and the committee will return it to you at the very earliest date, so as not to inconvenience you any.

"You are now excused, Mr. Nelson.

"Mr. Nelson. I am afraid I do not understand what it is you want me to do.

"Senator Hunt. Well, we will have a member of the staff—you tell me if you are not hearing—go with you out to your home and you turn over to him a statement of your net worth together with your little account book that you spoke of as the little red book, where you keep your 'ins' and 'outs', as you said. In addition to that, the subpoena that you are now testifying under will hold until such time as the committee releases the subpoena."

I interject again. My brethren say that the promise of the Committee to return the papers "at the very earliest date" bears vitally upon the search and seizure question. I do not see the pertinency of the promise to search and seiz-ure, because Nelson, having first volunteered to get the books, had agreed to get them before this promise was made.

The account of the visit to Nelson's home is as follows in the affidavit of the staff member and is uncontradicted:

"* * * pursuant to his instructions, affiant immediately accompanied Charles E. Nelson in the latter's automobile to his home in Prince Georges County, Maryland; that on arriving at the Charles E. Nelson home, affiant and Nelson went to an office which Nelson had there; that on a desk in said office there was a paper with what appeared to be several names thereon, and Mr. Nelson took the paper from the desk and put it in his pocket; affiant asked Charles E. Nelson where the 1951 'little red book' was, and he stated that it was not all together as yet but that he had something in the office which might serve as an indication of what his business was, and Nelson then went to a file cabinet and pulled out the bottom drawer; affiant saw about ten large envelopes, apparently filled with papers, and also two or three little bound books; Nelson picked up one of these books from the drawer and showed it to affiant; affiant examined the book and saw that it was a 1942 ledger concerning lottery and numbers operations in which Charles E. Nelson was involved; Nelson then told me that I could look in the drawer, see whatever I liked and take out whatever I wished, and that if I cared to take these records with me it would be perfectly all right. I asked Nelson if we might have the whole file and he said he would be glad to let me have anything I would like to have. I noticed, and Nelson stated to me, that there were no 1951 records among these envelopes, records and papers, and the latest of the data covered the year 1950, while the earliest year covered was the year 1940; affiant also observed that all

of these records related to lottery and numbers operations of Charles E. Nelson during that period; that Charles E. Nelson helped affiant tie the records, envelopes and data together and then helped affiant take them out and put them in the Nelson car and then he drove affiant and the records back to Washington, D. C."

It seems pertinent to me that, as a matter of fact, Nelson did not claim in his motion to suppress the evidence in the District Court that the obtaining of this material from him by the Committee was illegal; he claimed that the obtaining of the material by the United States Attorney from the Committee was an illegal search and seizure and violated his privilege against self-incrimination. In his affidavit in support of that motion, Nelson asserted that he "turned over to a Committee of the United States Senate" these books, etc. His point was that he had a "definite assurance" that they would be returned to him and that "no permission was ever given by him to said Committee to permit any other persons" to examine the documents. To me this is a clear statement that the possession of the documents by the Committee itself was deemed by Nelson to have been with his permission, even at so late a date as the time when he was moving for suppression of the evidence.

At the argument on the motion counsel for Nelson included the contention that the acquisition of the documents by the Committee was by an illegal search and seizure. The Government protested that argument. When the documents were proffered at the trial Nelson's counsel objected on the ground that they were obtained by a fraud, that is, the promise given Nelson by the Committee that they would be returned to him; and also on the ground that they were not admissible under the statute.[1] I do not find in the record of the trial, except in so far as the argument on the motion was incorporated in it, any contention respecting search and seizure by the

Committee. In the briefs filed in this court the point seems to be hinted at, but it is interwoven in the argument that the transfer of the papers from the Committee to the United States Attorney was a "trickery" and for that reason an illegal search and seizure; certainly the point that the Committee's acquisition of the documents was a search and seizure was not stressed. Able counsel represented these defendants throughout. Their lack of enthusiasm for the contention could not have been inadvertent. I think their estimate of its worth was correct.

I think we ought not to spin out a search and seizure where none exists in fact. No one, I think, is more emphatic than I am in respect to the constitutional protections of privacy both of person and of property. But we ought not to transmute invitation into invasion, admonitions normal in judicial proceedings into illegal compulsions, absence of objection into paralysis, proffers into searches, or acceptances into seizures; unless the facts compel us to do so.

Nelson was a witness. A witness must (a) answer questions and (b) tell the truth. If a witness does not answer questions he can be punished for contempt. If a witness does not tell the truth he can be punished for perjury. This is not merely coercion but is compulsion. Such compulsion is an essential and perfectly sound feature of the judicial process. It is quite customary for a court to warn a witness that he must tell the truth; the same should apply to other tribunals authorized to take testimony under oath. A witness may refuse to answer if (a) the question is not pertinent to the inquiry or (b) the answer would tend to incriminate him. But he must assert those reasons. If he does not assert them they are not available later. No objections to questions or to answering were made by Nelson before the Committee. Nelson's status, therefore, was that of a witness under compulsion to answer questions

[1]. 18 U.S.C. § 3486.

unless he interposed a valid objection, and he interposed none.

It is certainly clear that a statute compels witnesses before congressional committees to answer questions, under pain of fine and imprisonment, and the statute has been applied in many cases, from In re Chapman [2] to United States v. Bryan.[3] If it be agreed that Nelson's books could have been obtained by the Committee by an "orderly taking under compulsion of process,"[4] to wit, a *subpoena duces tecum,* the question in the case at bar becomes merely whether the formal execution of a subpoena is essential when a willing witness proffers and then delivers documents. The question is not whether the Committee ought to go to some other authority and get a subpoena; it is whether the Committee itself, having full subpoena powers, should be compelled to issue one upon a willing witness. To say that the formality is essential in such circumstances is, in my judgment, to magnify a technicality beyond all relation to reality.

My brethren would equate a representative of an investigating committee accompanying a witness to his home to obtain proffered evidence, with a police officer demanding entrance to a private home for a search without a warrant. I cannot equate them. They seem to me to be wholly different matters. The Committee had power to issue process for the compulsory production of the books. The idea was not that of the officer. It germinated in the very presence of the Committee, instigated by Nelson himself. Nelson was not in his home; he was on the witness stand, under subpoena and sworn. The action was not that of the officer on his own; it was directed by the tribunal which had power to compel it.

What would have made a difference, in my view, would have been an objection by Nelson. Then what was done would have instantly been restricted to the limitations upon and the formal requirements of official process.

My brethren say that Nelson was coerced. But I search the record in vain to find any coercion except that which arose from the fact that Nelson was a witness. The officer did not suddenly appear before Nelson and demand something. He was sent by the Committee pursuant to a request made by the Committee upon Nelson and acquiesced in by him.

The decision in the Judd case [5] is not pertinent here, in my view, because the facts there were totally different. Judd was a prisoner under arrest and in jail when his alleged consent was given; consent for a search was sought by uniformed police officers; there was an actual search in fact; the search was of Judd's residence; Judd was taken to his residence in handcuffs at two o'clock in the morning; no claim was made that assent to a search was given when the apartment was reached; it was not disputed that Judd's wife, who was in the apartment, protested the search. The question in the case was whether a consent given under such circumstances was a voluntary consent.

My brethren make reference to the facts that Nelson was not warned ahead of time that he need not answer incriminating inquiries and that he did not have counsel present. There is no rule of law that a witness must be warned [6]

2. 1897, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154.

3. 1950, 339 U.S. 323, 70 S.Ct. 724, 94 L. Ed. 884.

4. United States v. Morton Salt Co., 1950, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401.

5. Judd v. United States, 1951, 89 U.S.App. D.C. 64, 190 F.2d 649.

6. Bart v. United States, 1952, 91 U.S.App. D.C. 370, 203 F.2d 45, 49; Alford v. United States, 1931, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; United States v. Block, 2 Cir., 1937, 88 F.2d 618, certiorari denied, 1937, 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347; Pulford v. United States, 6 Cir., 1946, 155 F.2d 944; 8 Wigmore, Evidence § 2269 (3d ed. 1940).

or that he have counsel during his testifying.

Mr. Justice Jackson phrased my thought upon this case when he wrote, in Stein v. New York:[7]

"We are not willing to discredit constitutional doctrines for protection of the innocent by making of them mere technical loopholes for the escape of the guilty. The petitioners have had fair trial and fair review. The people of the State are also entitled to the due process of law."

If there was no illegal search and seizure the documents were admissible against all the defendants without further consideration except as to Nelson himself. I would agree with my brethren that, if the documents were obtained from Nelson by the Committee by an unconstitutional search and seizure, they should have been returned to him and therefore were not usable as evidence against anybody, in accordance with my understanding of the McDonald case.[8] As to Nelson himself, I must consider the effect of Section 3486 of Title 18 of the United States Code.

## II

As to the statute [9] I think it was error to admit the documents against Nelson. While they did not constitute "testimony" they did constitute evidence given by Nelson while he was a witness before the Committee. But I do not think this error constituted reversible error. There was more than ample other evidence to establish Nelson's guilt; evidence of employees, participants in the numbers game, etc. Some twenty witnesses who said they were employees of Nelson, or who said they were otherwise engaged in the numbers operation, testified. They all testified from personal knowledge. His guilt was unquestionably established beyond a reasonable doubt by evidence not connected with these records. No contradictory evidence was presented. The only attacks made on credibility were by cross examination. The documents here in dispute were at best cumulative to the direct testimony of the witnesses.

Whether a "lead" to any of this evidence was obtained from the documents is immaterial to consideration of the applicability of the statute. It was not established that the documents supplied such leads, but in any event, so far as the statute is concerned, the use of "leads" from testimony given by a witness is not prohibited. This is the rule of Counselman v. Hitchcock,[10] never overruled. An inquiry as to "leads" becomes pertinent when a constitutional privilege is asserted and the witness thereafter compelled to answer. Nelson asserted no such privilege in response to inquiry about the records.

Where an error is made in the admission of evidence by the trial court, the appellate court must exercise a careful judgment in determining whether it will or will not reverse. The rule [11] says that any error "which does not affect substantial rights" shall be disregarded. In Kotteakos v. United States [12] the Supreme Court told us that "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand * *."

---

7. 346 U.S. 156, 73 S.Ct. 1077.

8. McDonald v. United States, 1948, 335 U. S. 451, 69 S.Ct. 191, 93 L.Ed. 153.

9. In pertinent part Section 3486 of Title 18 provides: "No testimony given by a witness * * * before any committee of either House * * * shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury * * *."

10. 1892, 142 U.S. 547, 35 L.Ed. 1110, 12 S.Ct. 195.

11. Fed.R.Crim.P. 52(a), 18 U.S.C.

12. 1946, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557.

In Krulewitch v. United States[13] the Court said that "if upon consideration of the record the court is left in grave doubt as to whether the error had substantial influence in bringing about a verdict" we should reverse. We had the problem in Campbell v. United States.[14]

Applying the standard thus laid down, it seems clear to me that in view of the mass of direct testimony the error of admitting these documents against Nelson could have had but very slight, if any, effect upon the verdict. I do not reach this conclusion upon a delicate balance or upon any appraisal of the evidence. I reach it because of what seems to me to be overwhelming and certain.

### III

Taking the phases of the case in the order in which the court has considered them, I do not reach the question whether the action of the District Court, denying the motion to return the disputed documents and to suppress them as evidence, was *res judicata*. I intimate no opinion one way or the other on that point. I point out, however, that, as the court itself says, the present decision is in conflict with the Second Circuit in United States v. Poller[15] and with the Third Circuit in In re Sana Laboratories;[16] and, I add, with the language of Mr. Justice Brandeis in Cogen v. United States.[17] I also call attention to the fact that no objection was registered to the ruling by the trial court at the time of trial that the ruling on the motion was *res judicata* the point.

I would affirm the judgments.

13. 1949, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790.

14. 1949, 85 U.S.App.D.C. 133, 176 F.2d 45.

15. 1930, 43 F.2d 911, 74 A.L.R. 1382.

16. 1940, 115 F.2d 717, certiorari denied, 1941, 312 U.S. 688, 61 S.Ct. 615, 85 L. Ed. 1125.

17. 1929, 278 U.S. 221, 225, 49 S.Ct. 118, 73 L.Ed. 275.