**UNITED STATES of America**

v.

**Robert S. WYLIE, a/k/a Bobby S. Wylie, Appellant.**

No. 76–2005.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1977.

Decided Nov. 15, 1977.

Certiorari Denied March 27, 1978. See 98 S.Ct. 1527.

David B. Weinberg,* with whom Michael E. Geltner (appointed by this court), was on the brief, for appellant.

Carol E. Bruce, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and James M. Han-ny, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

Opinion filed by Circuit Judge SPOTTS-WOOD W. ROBINSON, III, dissenting in part.

McGOWAN, Circuit Judge:

This is an appeal from a conviction for one count of possession of a bank statement stolen from the mail in violation of 18 U.S.C. § 1708. The sole issue presented is whether the District Court erred in denying a pretrial motion to suppress the bank statement and the envelope in which it was enclosed, which appellant claimed were the fruits of an unreasonable investigative "seizure" of his person. Although this is a relatively close case on its facts, as Judge Bryant's comments in the course of the suppression hearing indicated, we are satisfied that the ruling here challenged did not contravene appellant's Fourth Amendment rights and, accordingly, affirm his conviction.

I

The only witness at the suppression hearing was Officer Franck, a veteran of six years with the Metropolitan Police Department, throughout which time he had engaged in routine patrols of local banks as part of his official duties. In the early afternoon of February 10, 1976, having been assigned to "bank detail" for the day, Officer Franck entered a branch of the National Bank of Washington located in the 1300 block of Connecticut Avenue, Northwest. Although he had been in that particular branch "many, many times," he was not himself a customer of the bank and did not know which of the counter slips were withdrawal slips and which were deposit slips.

* Entered an appearance as Student Counsel pursuant to Rule 20 of the General Rules of this Court.

According to his testimony, Officer Franck first observed appellant from about 25 feet away, as the latter was standing in line at a teller's window, holding a blue piece of paper which, because of its size, appearance, and color, Franck assumed to be a check. The officer's attention was drawn to appellant because "his pants were kind of shaggy"; "[h]e was dressed fairly modestly"; and, more generally, "[h]e didn't appear to be right inside the bank." Tr. 9–10. While Franck walked to the "bank book," which officers on bank detail are required to sign, and after he had written in the book, the officer continued to watch appellant.

When appellant got to the teller's window, he waved the blue piece of paper in the air and then presented it to the teller. Officer Franck observed "[t]he bank teller look[ ] down at the slip of paper, turn[ ] it around and look[ ] at it and read it and immediately, within a matter of a second or two, push[ ] it back toward" appellant. A brief conversation between appellant and the teller ensued, but the officer was able to overhear only two words, "bank official."

Appellant picked up the piece of paper, turned, and saw Officer Franck looking at him. After three to five seconds of eye contact, appellant avoided looking further at Franck and walked up to a bank official. Instead of showing the piece of paper to the official, appellant placed it inside a brown envelope he had been carrying in his hand, and put the envelope in his pocket. He spoke for "one or two seconds" to the official, Tr. 23, then turned and "started walking fast out of the bank, not [at] the same pace he had been moving," Tr. 12.

His interest aroused, Franck followed appellant out of the bank [1] and, having caught up with him on the sidewalk immediately outside, asked appellant, "Sir, may I talk to you a moment?" Tr. 13. When appellant responded "okay," the officer went to his scooter parked in front of the bank and took out a copy of police department form 76, used to record information about preliminary investigative inquiries.[2] Franck began to fill out the form, and asked appellant for his name. Appellant told the officer that his name was "William Witherspoon," and that he lived on Ontario Road, Northwest.

Officer Franck then asked appellant if he had any identification, but appellant responded that he did not. The officer testified that his suspicions were amplified by this development:

Right away it struck me funny. Why does a man go into a bank to cash a check without some sort of identification.

Tr. 14; see id. 36. When Franck asked whether appellant was sure he did not have any identification, appellant replied that all he had was a withdrawal slip, which he had intended to use to take money out of his savings account. The officer requested to see the slip, and appellant took the brown envelope out of his pocket and removed the blue slip of paper which the officer had previously believed to be a check. The blue slip was in fact a withdrawal slip, with the name "William Witherspoon" written on it, and accordingly the officer transcribed this name onto P.D. Form 76.

Officer Franck asked appellant for his address and phone number, but appellant said that he did not have a phone number. Franck then asked appellant why he did not have any identification when he attempted to withdraw money from his savings account, and according to Franck's testimony appellant gave the following answer:

1. The officer testified that he did not have time to talk with the teller of the bank official before appellant walked out of the bank. Tr. 23.

2. Pursuant to police regulations, P.D. Form 76 may be used to report the circumstances surrounding a "contact" (defined as "[c]onduct by an officer which places him in face-to-face communication with an individual under circumstances in which the individual is free to leave if he wishes"); and must be used to record any non-forcible "stop" (defined as "temporary detention of a person for the purpose of determining whether probable cause exists to arrest that person"). A different form, P.D. Form 253, must be filled out in the event of a stop effectuated through force. Metropolitan Police Department General Order No. 304–10 (effective July 1, 1973).

He said he went into [the] bank and made a mistake. He tried to get some money from his savings account, and he had the checking account number [marked on the withdrawal slip].

Tr. 14–15. The officer then "started asking questions," "but everything was funny." Tr. 15.

At this point, Franck addressed the following question to appellant:

Mr. Witherspoon, would you mind coming back inside the bank with me, and we will talk to the manager, and if everything is okay, you can go.

Tr. 15. Appellant answered "no," that he would not mind, which the officer apparently interpreted as consent to return to the bank. See Tr. 17.[3]

Once inside the bank, Officer Franck and appellant approached the bank official whom appellant had addressed very briefly on the way out of the bank. Franck asked the official, a Mr. Stewart, what appellant had said as he walked out; and Stewart replied, according to Franck, that appellant had simply stated "I will see you later." Tr. 17. Franck then requested Stewart to confirm that a Mr. William Witherspoon had an account with the bank. When a telephone call yielded the response that there was no account in that name, Stewart asked appellant if he had a middle initial. Rather than answering immediately, appellant started snapping his fingers and "rung [sic] his head," and "beads of perspiration came out all over his forehead." Tr. 18, 24.

After about 15 or 20 seconds, appellant said his middle initial was "M," and Mr. Stewart verified the existence of both a checking and savings account in the name of William M. Witherspoon. However, the address listed on the accounts was different from the one given by appellant outside the bank, and that date of birth on the bank's records did not match the date given by appellant in response to a question from Officer Franck. When the officer asked appellant how long the accounts had been open, appellant again started snapping his fingers, and responded "one year," but Mr. Stewart's information indicated that the accounts had in fact been open three-and-one-half years. Observing what appeared to be a wallet in appellant's inside coat pocket, Franck again asked appellant if he had any identification, but appellant stated that he did not.

After consulting by telephone with a detective from the Check and Fraud Section of the Metropolitan Police Department, Officer Franck placed appellant under arrest for attempted false pretenses, 22 D.C.Code §§ 103, 1301. Incident to that arrest, Franck seized the wallet and a brown envelope from appellant's coat pocket. Inside the wallet was a birth certificate in the name of Bobby Samuel Wylie; and inside the brown envelope was a bank statement in the name of William Witherspoon, listing the account number of a checking account, and showing a balance of $412. The blue withdrawal slip which appellant had given to Officer Franck was a savings account withdrawal slip, made out for $400, and inscribed with the checking account number displayed on Witherspoon's bank statement.

Later investigation revealed that the bank statement had been placed in the

---

**3.** In response to defense counsel's question as to whether appellant was free to go at this time, Franck stated:

Sir, if he turned and walked away from me then, as long as I have been a policeman, I know I couldn't have stopped him. He could have kept right on going. And I would have had no choice but to let him walk.

Tr. 15. Evidently, this statement reflected the officer's belief that probable cause was necessary in order to compel appellant to go back into the bank, since Franck had stated earlier:

I would have had to let him go because I didn't feel that there was probable cause at that time. I merely had a suspicion, which was being amplified as each moment passed by.

See Tr. 36.

At some point prior to re-entering the bank, Officer Franck radioed in the name "William Witherspoon" to police headquarters, to check for outstanding arrest warrants. This apparently was a normal procedure when filling out Form 76 on an individual. Franck did not wait for an answer before escorting appellant into the bank. Tr. 19–20.

United States mail on February 9, 1976, the day before it was found in appellant's possession, and that Witherspoon's mail box had been broken into on February 10. On March 10, 1976, appellant was indicted for possession of stolen mail, 18 U.S.C. § 1708, and attempted false pretenses, 22 D.C.Code §§ 103, 1301. Defense counsel's motion to suppress the bank statement and brown envelope was denied by Judge Bryant on August 4, 1976, following the evidentiary hearing on the motion to suppress. A bench trial was held on September 9, 1976, and the bank statement and envelope were admitted into evidence over objection. Appellant was found guilty of both offenses charged, but the false pretenses count was subsequently dismissed with the consent of the Government. On October 27, 1976, the District Court sentenced appellant to six to thirty months imprisonment. This appeal followed.

## II

Appellant concedes that probable cause for arrest existed following the investigation inside the bank, and that if the police conduct leading up to the formal arrest was proper, the bank statement and the brown envelope were validly seized incident to arrest. The controversy centers around the interrogation of appellant on the sidewalk outside the bank, and his return into the bank for further investigation. Appellant contends, first, that the encounter on the sidewalk was an investigative "stop" without the reasonable, articulable grounds required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and, second, that the re-entry into the bank constituted an arrest without probable cause, or, alternatively, an unwarranted extension of the *Terry* stop after the original grounds for suspicion had vanished. At the other extreme, the Government argues, *inter alia*, that Officer Franck had reasonable, articulable grounds for suspicion of appellant from the time of the initial approach on the sidewalk, justifying a forced investigative stop, and that appellant consented to go back into the bank.

As the Supreme Court noted in *Terry, supra* at 13, 88 S.Ct. at 1875, "[s]treet encounters between citizens and police officers are incredibly rich in diversity," and consequently each case must be evaluated in light of the particular array of facts presented, *see id.* at 13–16, 88 S.Ct. 1868. Our examination of the record in this case causes us to reject the extreme positions advanced by both appellant and the Government. It is our view that the police conduct at issue here involved a proper progression of escalating responses to circumstances which generated a mounting degree of suspicion that a crime had occurred. More particularly, we hold that (1) the initial approach on the sidewalk constituted a mere "contact," and not a compelled investigative stop, and therefore did not require reasonable, articulable grounds for suspecting that appellant had committed a crime; (2) the necessary basis for an investigative stop existed at least from the time Wylie produced the withdrawal slip, and nothing else, in response to Officer Franck's request for identification; and (3) the re-entry into the bank for the purpose of further investigation was justified under the *Terry* stop doctrine, and did not amount to an arrest without probable cause.

### A

It is well-settled that the Fourth Amendment applies to "seizures" of the person which fall short of traditional arrests, and that such restraints on personal freedom may be justified on a showing of less than probable cause if, and only if, the police conduct is "reasonable." *See, e. g., United States v. Brignoni-Ponce*, 422 U.S. 873, 878–81, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio, supra*, 392 U.S. at 16–27, 88 S.Ct. 1868; *United States v. Coates*, 161 U.S.App.D.C. 334, 337, 495 F.2d 160, 163 (1974). "As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States*

*v. Brignoni-Ponce, supra,* 422 U.S. at 878, 95 S.Ct. at 2578–79, *citing, inter alia, Terry v. Ohio, supra,* 392 U.S. at 20–21, 88 S.Ct. 1868. A general rule which has emerged from this balance is that "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio, supra* at 21, 88 S.Ct. at 1880, *see United States v. Brignoni-Ponce, supra,* 422 U.S. at 881, 884, 95 S.Ct. 2574.

■ But police-citizen communications which take place under circumstances in which the citizen's "freedom to walk away" is not limited by anything other than his desire to cooperate do not amount to "seizures" of the person, and consequently may be initiated without a reasonable, articulable suspicion, much less probable cause. *See Terry v. Ohio, supra,* 392 U.S. at 16, 19 n. 16, 88 S.Ct. 1868; *Coates v. United States,* 134 U.S.App.D.C. 97, 413 F.2d 371 (1969). As the Court in *Terry* noted, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

And Justice White's concurring opinion in *Terry* added:

> There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.

*Id.* at 34, 88 S.Ct. at 1886 (White, J., concurring). *See also id.* at 32–33, 88 S.Ct. 1868 (Harlan, J., concurring); *Davis v. Mississippi,* 394 U.S. 721, 727 n. 6, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

The Metropolitan Police Department's regulations governing investigative procedures recognize this distinction between mere "contacts," which are not subject to Fourth Amendment limitations, and investigative "stops," which must be supported by a reasonable suspicion. Metropolitan Police Department General Order No. 304–10 (effective July 1, 1973); *see* note 2 *supra.* A "contact" is defined as "[c]onduct by an officer which places him in face-to-face communication with an individual under circumstances in which the individual is free to leave if he wishes,"[4] whereas a "stop" is described as follows:

> A "stop" is the temporary detention of a person for the purpose of determining whether probable cause exists to arrest that person. A stop occurs whenever an officer uses his authority to compel a person to halt, or to keep him in a certain place, or to require him to perform some act . . . . If a person is under a reasonable impression that he is not free to leave the officer's presence, a "stop" has occurred.

■ As the police regulations concede, *see* note 4 *supra,* there can be no question that a "stop" has occurred where physical force has been used to detain a person against his will, or the individual has been

---

**4.** The section of General Order No. 304–10 dealing with "contacts" goes on to provide in relevant part:

> Contacts may be initiated by an officer when he reasonably believes that investigation of a situation is justified. The standard for police-citizen contact is not "probable cause," "reasonable suspicion," or any other specific indication of criminal activity.
>
> *1. Initiating a Contact.*
>
> An officer may initiate a contact with a person in any place in which the officer has a right to be. It is difficult to define precisely such places. Generally, they may include: (1) areas of government-owned or possessed property normally open to members of the public; . . . .

> *2. Conduct of Contacts.*
>
> Persons "contacted" may not be detained against their will or frisked. They may not be required to answer the officer's questions or in any way respond to the officer if they choose not to do so. The officer may not use force or coercion to attempt to require citizens to stop or respond. If they refuse to cooperate, they *must* be permitted to go on their way; however, if it seems appropriate under the circumstances, they may be kept under surveillance. Since a contact is *not* a stop or an arrest and the person contacted may be innocent of wrongdoing of any kind, officers should take special care to act in as restrained and courteous manner as possible. (emphasis in original)

subjected to a "frisk" for weapons. *See Terry v. Ohio, supra* 392 U.S. at 16–17, 19, 88 S.Ct. 1868. The difficulty comes in distinguishing between "non-forcible stops," *i. e.,* stops effectuated through a show of authority without the use of force, and mere "contacts." In such situations, the crucial consideration is the one set forth in the police definition quoted above: whether the person was "under a reasonable impression that he [was] not free to leave the officer's presence." We would only add that in determining whether such a reasonable impression existed, the test must be " 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' " *Coates v. United States, supra* 134 U.S.App.D.C. at 99, 413 F.2d at 373, *quoting United States v. McKethan,* 247 F.Supp. 324 (D.D.C.1965), *aff'd by order,* No. 20,059 (D.C.Cir.1966).

■ Applying these standards to the facts before us, we conclude that Officer Franck's initial approach to appellant on the sidewalk outside the bank constituted a "contact" and not a "stop". Clearly, no physical force or physical contact of any kind was used to restrain appellant's freedom of movement. And, although a refined judgment is required, we believe that an innocent person in appellant's position would not have felt compelled to respond affirmatively to the officer's request for information. The tone of Officer Franck's question—"Sir, may I talk to you a moment?"—strongly suggests that appellant was free to leave if he so desired, and nothing in his response indicates the contrary. It was, at least, within a reasonable range of interpretation for Judge Bryant to conclude that this was the case.

### B

■ We need not decide whether there came a point in the sidewalk encounter, prior to the request to return to the bank, when the intensification of the questioning would have led a reasonable person to believe that he was no longer free to go. If such ·a point occurred, we believe it was after Wylie had produced the withdrawal slip—and only the withdrawal slip—in response to the police officer's request for identification; and that circumstance, together with the events observed in the bank, provided sufficient grounds for an investigative stop within the contemplation of *Terry.*

In determining whether the specific and articulable facts recited by the police officer added up, following the production of the withdrawal slip, to a reasonable suspicion justifying brief detention for questioning we are guided by the general principle

> that in judging the reasonableness of the actions of the officer the circumstances before him are not to be dissected and viewed singly; rather, they must be considered as a whole. So considered they are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.

*United States v. Hall,* 174 U.S.App.D.C. 13, 15, 525 F.2d 857, 859 (1976), *citing United States v. Davis,* 147 U.S.App.D.C. 400, 458 F.2d 819 (1972).

Officer Franck was a veteran police officer with extensive experience in observing banks and banking activity. In this case, he observed the following inside the bank: 1) a purported bank customer attempted to negotiate what appeared to be a check, which was rejected on its face by the bank teller; 2) in the ensuing conversation, the man was apparently referred to a bank official but, after seeing the police officer, merely approached a bank official, uttered a few words and, instead of showing the slip of paper to the official, placed it in an envelope in his pocket; and 3) without expressing any anger or frustration at the rejection of his transaction, or pursuing a discussion with the bank official, walked very rapidly out of the bank.[5]

---

5. Under these circumstances we think a purely voluntary "contact" approach by the police officer to appellant was unobjectionable, irrespective of the latter's physical appearance; and we attach no significance to Officer Franck's characterization of that appearance,

Although these circumstances alone could not have formed the basis for a reasonable suspicion that criminal activity had occurred, that standard was satisfied when Wylie stated on the sidewalk that the only identification he had was a withdrawal slip which he had intended to use to withdraw money from his savings account, and removed the slip from an envelope in his pocket. At that point, the transaction in the bank took on an indisputably suspicious character warranting further investigation. According to his own admission, appellant had attempted to withdraw money from a savings account without any identification or evidence that the account was his, other than his own representation in the form of a withdrawal slip. Failure to carry identification is, of course, not itself a crime nor, in most circumstances, even a ground for suspecting criminal activity; and appellant's inability to produce identification here was not enough to show probable cause that he had committed a crime. But surely it is unusual for an individual to attempt to withdraw money from a personal savings account without being prepared to display some evidence that he owns or controls the account—a savings passbook or bank account identification card, if not additional identification as well—and, in light of what he had observed in the bank, Officer Franck could reasonably have suspected when the only identification appellant was able to produce was the disputed transaction slip itself, that he had attempted to withdraw money from someone else's account.[6]

C

Whether or not appellant's freedom of movement became constrained somewhat earlier, we believe that a reasonable person in his position would no longer have felt free to leave when Officer Franck "invited" him to return to the bank. Although framed as a question rather than a command—"Mr. Witherspoon, would you mind coming back inside the bank with me"—the officer's remark continued with the observation that "we *will* talk to the manager, and *if* everything is okay, you can go." Tr. 15 (emphasis supplied). The clear implication, inasmuch as the request followed on the heels of direct questioning about appellant's business in the bank, was that appellant would be free to go if, but only if, further investigation inside the bank exonerated him.[7]

Notwithstanding appellant's assertion that any original grounds for suspicion had vanished by this time, it seems clear that Officer Franck's suspicions could only have continued to increase following appellant's production of the withdrawal slip. When the officer asked appellant why he did not have any identification when he attempted to withdraw money from his savings account, rather than providing an innocent explanation or even a responsive answer, appellant volunteered a highly implausible explanation for why his transaction had failed—he claimed that he had "mistakenly" written his checking account

as we are confident the district judge did not either.

**6.** Whether the police officer had grounds for reasonable suspicion as of the time of appellant's initial response—that he did not have any identification—is less clear. At that point, the officer still believed that appellant had tried to cash a check rather than withdraw money from a savings account, and it is perhaps less unusual to attempt to negotiate a check without additional identification, since possession of a check engraved with a particular account number is probably more reliable evidence of ownership of that account than a savings withdrawal slip with the account number written in by hand.

**7.** The police officer's statement that if appellant had simply walked away at this point, he would not have been stopped, is of course not dispositive of how a reasonable person in appellant's position would have viewed the situation. And, especially in light of the fact that appellant was promised his freedom if, and impliedly only if, he returned to the bank, we cannot say that his "consent" to the return was "freely and voluntarily given." *Schneckcloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854; *see id.* at 227, 93 S.Ct. 2041; *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

number on the savings account slip.[8] On the other hand, the Government does not argue, nor do we believe it could, that probable cause for arrest existed on the basis of this response.

The question thus becomes whether compelled reentry into the bank for a brief inquiry could be justified as part of an investigative "stop" or instead constituted an "arrest" without probable cause. Or, to put the question less metaphysically, whether returning appellant to the suspected scene of the crime, a few feet from where he and the officer were standing, for a brief investigation after which appellant would be free to go if his story checked out, could be justified on less than probable cause. We hold, on the basis of the general principles established in *Terry v. Ohio, supra,* that the return to the bank was a reasonable procedure for investigating the suspicious circumstances with which Officer Franck was confronted. *See Cooper v. United States,* 368 A.2d 554, 556–57 (D.C.Ct.App. 1977) (reaching same conclusion on substantially similar facts). *See also Young v. United States,* 140 U.S.App.D.C. 333, 337, 435 F.2d 405, 409 (1970).

As the Supreme Court observed in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), *Terry* recognizes the propriety of an "intermediate response"— between the extremes of arrest and simply walking away—in circumstances warranting reasonable suspicion of criminal activity:

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Id.* at 145–46, 92 S.Ct. at 1923 (citations omitted). The general constraint set forth in *Terry* is that an investigative seizure must be "reasonably related in scope to the justification for [its] initiation." *Terry v. Ohio, supra,* 392 U.S. at 29, 88 S.Ct. 1868, 1884; *accord, United States v. Brignoni-Ponce, supra,* 422 U.S. at 881, 95 S.Ct. 2574.[9] And, in determining reasonableness, "the facts [must] be judged against an objective standard: would the facts available to the officer at the moment of seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1880, *quoting Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Here, the police officer was faced with circumstances creating a reasonable suspicion that appellant had unlawfully attempt-

---

**8.** Certainly it would be unusual for the true owner of a savings account to attempt to recall his account number from memory (rather than copying it from some written record), let alone to make a mistake and recall and transcribe his checking account number instead.

**9.** There is dictum in *United States v. Brignoni-Ponce, supra* at 881–82, 95 S.Ct. at 2580, to the effect that in an investigative stop of a vehicle suspected of containing illegal aliens,

> The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

No suggestion was made in that case, however, that further detention might be reasonably related to the justification for the initial stop; and, indeed, in the context of border patrols searching for illegal aliens, it is hard to imagine a reasonable ground, absent evidence of some other form of criminal activity, for further detention without consent or probable cause. As we explain below, the circumstances of the instant case are distinguishable in that regard.

ed to withdraw money from someone else's bank account. By returning with appellant to the suspected scene of the crime, a few feet away, and making a brief investigation, the officer could resolve whether a crime had in fact been committed. If so, appellant would be arrested on probable cause; if not, he would be free to go. In these circumstances, we think that it was open to the District Court to conclude that the action taken by the officer was entirely appropriate.[10]

United States v. Jennings, 468 F.2d 111 (9th Cir. 1972), cited by appellant for the proposition that extension in time and space of an investigative stop may be unjustified, even though the police officer has legitimate grounds for a more limited stop, is distinguishable. In that case, a person suspected of owning marijuana which had been found in a nearby house, was stopped on the street and transported by car to the Sheriff's office, where he was subjected to "prolonged" detention, id. at 114, 115, lasting 20–25 minutes, during which he was interrogated, fingerprinted, photographed, and required to fill out an arrest form. This prolonged detention at the Sheriff's office, a distance away from the place at which the initial stop occurred, was both

more intrusive and less likely to yield immediate results than the investigative procedure employed here.[11]

Concluding, as we do, that Judge Bryant's disposition, after a full evidentiary hearing, of the pretrial suppression motion was a permissible relation of the facts adduced to established legal principles, we think the contested evidence was admissible at trial, and the judgment of the District Court is accordingly affirmed.[12]

It is so ordered.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part:

With much of Judge McGowan's able opinion for the court I am essentially in accord. Officer Franck's sidewalk encounter with appellant began as a non-coercive, non-trespassory investigative inquiry that appellant could indulge or ignore at will.[1] So long as the confrontation retained those attributes, the Fourth Amendment was not implicated in the least.[2] When, however, appellant was asked to accompany the officer back to the bank, a new element emerged, for appellant could hardly have felt free to do otherwise.[3] That restraint summoned a test by the principles articulat-

10. It was not unreasonable for Officer Franck to take appellant back into the bank without waiting for the results of the warrant check on "William Witherspoon," see note 3 supra. Since the suspected crime involved impersonation of Witherspoon, Witherspoon's arrest record would have been largely irrelevant.

11. The recent case of United States v. McCaleb, 552 F.2d 717 (6th Cir. 1977), reported in 45 U.S.L.W. 2520, in which three persons suspected of trafficking in narcotics were stopped by federal agents in a parking lot outside the Detroit Metropolitan Airport and taken into a small office in the airport pending further investigation, is also distinguishable. Although the Sixth Circuit held that an arrest without probable occurred when the individuals were taken to the private office and held there against their will, this investigative seizure evidently was not even supported by a reasonable suspicion. Moreover, in light of the fact that the individuals were threatened with indefinite detention pending acquisition of a warrant to search their luggage, which led to an invalid consent search in which drugs were discovered,

the intrusion on their personal liberty was clearly greater than in the instant case.

12. The dissent, in steadily escalating hyperbole, has chosen finally to characterize the result we reach as initiating a repressive rule of law requiring every person to be always in possession of identification data producible on demand by any policeman at any time and for any or no reason. In the narrow context of the evidentiary record before us, revealing circumstances in which identification is normally expected to be available and where its absence had a relevance for law enforcement purposes peculiar to those special circumstances, we find the dissent's language in this regard surprising, as will also, we believe, the District Court before whom that record was made and whose decision we affirm.

1. Discussed infra Part I(B).

2. Discussed infra Part I(A).

3. Discussed infra Part I(B).

ed in *Terry,*[4] with the admissibility of ensuing incriminations hanging in the balance.[5] With all of these propositions I fully agree.

I must part company with the court, however, when it concludes that *Terry* requirements were met in this case. In my view, the justification urged for the return trip to the bank—appellant's inability to produce identification [6]—does not pass muster under the Fourth Amendment.[7] If I am correct, the resulting encroachment upon appellant's liberty was illegal, and demanded suppression of the evidentiary discoveries it made possible.

## I. THE IMPOSITION OF THE DETENTION

All agree that by the time appellant was arrested, Officer Franck had derived probable cause therefor from developments following their return to the bank. And, among the members of the court, it is common ground that probable cause for appellant's arrest did not accrue until after they had left the sidewalk.[8] But, as *Terry* made clear, the reach of the Fourth Amendment is not limited to constraints rising to the stature of formal arrests; even a relatively brief street-stop may fall within its compass,[9] and accordingly must be adequately justified.[10] The threshold questions here are whether there was a constitutionally cognizable detention on the sidewalk and, if so, at just what point it occurred.

4. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

5. Discussed *infra* Part II.

6. See Majority Opinion (Maj.Op.) at note 6, discussed *infra* Part IV.

7. Discussed *infra* Part III.

8. See Maj.Op. following note 5.

9. "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio, supra* note 4, 392 U.S. at 16, 88 S.Ct. at 1877, 20 L.Ed.2d at 903. See also *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 614 (1975).

### A. The Governing Principles

In *Terry* the Court observed, "[s]treet encounters between citizens and police officers are incredibly rich in diversity." [11] A factor often contributing to variegation—and one invariably separating the constitutionally permissible from what may be constitutionally forbidden—is the degree of impediment to the citizen's freedom of action. "Obviously," the Court declared, "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." [12] So long as the citizen is free to disregard or terminate the contact and go his way as he pleases, the Fourth Amendment interposes no obstacle to a policeman's mere effort at conversation.[13] And as we ourselves have observed,

[e]ncounters vary in the degree of intrusion; plainly there is a difference between an order to stop and give identification and a command to remain in a certain place for questioning for as long as twenty minutes.[14] And although some degree of restraint and constraint may be present whenever police officers confront citizens to ask questions,[15] . . . such encounters differ in their potential

10. Discussed *infra* Part II.

11. *Terry v. Ohio, supra* note 4, 392 U.S. at 13, 88 S.Ct. at 1875, 20 L.Ed.2d at 901.

12. *Id.* at 19 n.16, 88 S.Ct. at 1879 n.16, 20 L.Ed.2d at 905 n.16.

13. *Coates v. United States,* 134 U.S.App.D.C. 97, 100, 413 F.2d 371, 374 (1969).

14. Citing, in a footnote at this point, American Law Institute, Model Code of Pre-Arraignment Procedure, § 110.2(1) (Official Draft No. 1, 1972) (street-stop not exceeding 20 minutes authorized under certain circumstances).

15. Citing, in text at this point, *Allen v. United States,* 129 U.S.App.D.C. 61, 390 F.2d 476 (1968).

for intimidation and abrasion. Delineation of the Fourth Amendment limitations on police investigative activity must proceed with sensitivity to these differences.[16]

Ofttimes the boundary between voluntary and involuntary on-street colloquy with police officers is elusive.[17] Many people at bottom will think twice before spurning an importuning policeman. This is not to suggest that that circumstance alone makes one inexorably a captive,[18] for if it did no police-citizen investigative contact would ever withstand scrutiny. It is to say that the line of demarcation lies at the point of some different and larger restraint.

In the quest for greater precision in this regard, we may profitably take a page from history. Bodily detention within the contemplation of the Fourth Amendment has traditionally been viewed as a consequence not simply of particular police conduct but also of its expectable impact upon the mind of the detainee.[19] And as we have heretofore proclaimed, " 'the test must not be what the [detainee] himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the [detainee's] shoes.' "[20] That declaration was made in the context of a skirmish culminating in what was alleged to be an arrest, but logic dictates its applicability for purposes of determining whether a detention of potentially less magnitude has taken place. Indeed, that is the criterion by which the local police themselves abide.[21]

**16.** *United States v. Coates,* 161 U.S.App.D.C. 334, 338, 495 F.2d 160, 164 (1974) (footnotes omitted).

**17.** "Whether police have left the channel of 'investigation' and run onto the shoals of 'custodial interrogation' cannot be determined by reference to some chart clearly designating the various lights, bells, buoys and other channel markers." *Allen v. United States, supra* note 15, 129 U.S.App.D.C. at 63–64, 390 F.2d at 478–479.

**18.** As we have had occasion to note, *United States v. Coates, supra* note 16, 161 U.S.App. D.C. at 338 n. 5, 495 F.2d at 164 n. 5, the constraint frequently accompanying police-citizen encounters has not been decisive of the question whether consent to a search is voluntary. See *Schneckloth v. Bustamonte, 412 U.S.* 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**19.** See, e. g., *Kelley v. United States,* 111 U.S. App.D.C. 396, 398, 298 F.2d 310, 312 (1961); *Coleman v. United States,* 111 U.S.App.D.C. 210, 218, 295 F.2d 555, 563 (*en banc* 1961), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962).

**20.** *Coates v. United States, supra* note 13, 134 U.S.App.D.C. at 99, 413 F.2d at 373, quoting *United States v. McKethan,* 247 F.Supp. 324, 328 (D.D.C.1965), *aff'd,* No. 20,059 (D.C.Cir. Oct. 6, 1966) (unpublished order.) See also *Yam Sang Kwai v. INS,* 133 U.S.App.D.C. 369, 372, 411 F.2d 683, 686, *cert. denied,* 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969); *Bailey v. United States,* 128 U.S.App.D.C. 354, 363, 389 F.2d 305, 314 (1969) (concurring opinion); *Kelley v. United States, supra* note 19, 111 U.S.App.D.C. at 398, 298 F.2d at 312.

**21.** Metropolitan Police Department General Order 304–10 categorizes non-arrest citizen-encounters as either "contacts" or "stops." A "contact" is "[c]onduct by an officer which places him in face-to-face communication with an individual under circumstances in which the individual is free to leave if he wishes," and "may be initiated by an officer when he reasonably believes that investigation of a situation is justified." *Id.* pt. I(A). Thus "[t]he standard for police-citizen contacts is not 'probable cause,' 'reasonable suspicion,' or any other specific indication of criminal activity." *Id.* The order emphasizes that

[p]ersons "contacted" may not be detained against their will or frisked. They may not be required to answer the officer's questions or in any way respond to the officer if they choose not to do so. The officer may not use force or coercion to attempt to require citizens to stop or respond. If they refuse to cooperate, they *must* be permitted to go on their way, however, if it seems appropriate under the circumstances, they may be kept under surveillance.

*Id.* pt. I(2) (emphasis in original). A "stop," on the other hand, "is the temporary detention of a person for the purpose of determining whether probable cause exists to arrest that person . . . .," and "occurs whenever an officer uses his authority to compel a person to halt, or to keep him in a certain place, or to require him to perform some act (such as walking to a nearby location where the officer can use a radio, telephone, or call box)." *Id.* pt. I(B). As the order makes clear, "[i]f a person is under a reasonable impression that he is not free to leave the officer's presence, a 'stop' has occurred." *Id.*

## B. *The Imposition Here*

With these considerations in mind, I approach the confrontation of appellant by Officer Franck on the sidewalk outside the bank. For a while, it lacked any significant indicium of duress other than whatever may be inherent in any face-to-face meeting between a citizen and a police officer. Certainly the officer's opening inquiry—"Sir, may I talk to you for a moment?"[22]—did not on its face suggest that appellant was compelled to do so. Nor did appellant's spontaneous response—"Okay"[23]—indicate anything other than a willingness to cooperate. During most of the ensuing conversation, there was no exertion of official authority, no hint of force, and no frisk or other encroachment upon bodily integrity. So long as these circumstances endured, there was little or no likelihood that one innocent of crime would reasonably have felt unable to walk away whenever he chose.

There did, however, come a time at which the prevailing conditions changed radically. That was when Officer Franck asked appellant to return to the bank. "[W]ould you mind coming back inside the bank with me?",[24] the officer put it; there "we will talk to the manager, and if everything is okay[ ] you can go."[25] Like my colleagues,[26] I think it clear that, against the backdrop of the interrogation proceeding it, an innocent person in that situation would reasonably have taken the officer's utterance not as a mere supplication, but as a command.[27] And the officer's proposition, as framed, unmistakably implied that appellant's liberty of movement was no longer unencumbered, but had become dependent upon such resolution of the officer's suspicions as might be made inside the bank.[28] From that point onward appellant was under restraint,[29] and justification therefor became imperative.

## II. THE PRECONDITIONS TO NON–ARREST DETENTION

Only if appellant's involuntary sojourn at the bank was lawful could the incriminating evidence gleaned therefrom validly serve as a predicate for his conviction.[30] Fruit of an unconstitutional seizure cannot

---

**22.** Transcript of Hearing on Motion to Suppress (Tr.) 13.

**23.** Tr. 13.

**24.** Tr. 15.

**25.** Tr. 15.

**26.** Maj. Op., 186 U.S.App.D.C. at ——, 569 F.2d at 69.

**27.** Compare *Jackson v. United States*, 118 U.S. App.D.C. 341, 343, 336 F.2d 579, 581 (1964); *Kelley v. United States, supra* note 19, 111 U.S.App.D.C. at 398, 298 F.2d at 312.

**28.** I am advertent to Officer Franck's testimony that "if [appellant] had turned and walked away from me, then, as long as I have been a policeman, I know I couldn't have stopped him. He could have kept right on going. . . ." Tr. 15; see also Tr. 24. The decisive factor, however, is the effect of the officer's "request" upon appellant's state of mind, and not the officer's uncommunicated assessment of what it was. See text *supra* at notes 19–21. As the District Court aptly observed, Officer Franck's statement bore "all indicia of authority. Who disobeys a policeman?" Tr. 29.

**29.** The circumstances leading to this conclusion also negate any idea of consent to the return trip to the bank. Consent presupposes an absence of compulsion, including that induced by the appearance of lawful authority, *Schneckloth v. Bustamonte, supra* note 18, 412 U.S. at 233, 93 S.Ct. at 2051, 36 L.Ed.2d at 866; *Gatlin v. United States*, 117 U.S.App.D.C. 123, 130, 326 F.2d 666, 673 (1963); *Nelson v. United States*, 93 U.S.App.D.C. 14, 18, 21–22, 208 F.2d 505, 509, 512–513, *cert. denied*, 346 U.S. 827, 74 S.Ct. 48, 98 L.Ed. 352 (1953), and, when urged in support of an act otherwise violative of Fourth Amendment rights, must be convincingly demonstrated. *Judd v. United States*, 89 U.S.App.D.C. 64, 67, 190 F.2d 649, 652 (1951); *Gibson v. United States*, 80 U.S.App.D.C. 81, 83, 149 F.2d 381, 383, *cert. denied*, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945); *Nueslein v. District of Columbia*, 73 App.D.C. 85, 89, 115 F.2d 690, 694 (1941).

**30.** *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441, 453 (1963); *United States v. Montgomery*, 182 U.S. App.D.C. 426, 429, 561 F.2d 875, 878 (1977); *Bailey v. United States, supra* note 20, 128 U.S.App.D.C. at 357, 389 F.2d at 308.

be utilized affirmatively to establish guilt on the part of its victim,[31] and this prohibition bars physical items uncovered,[32] utterances made [33] and conduct observed [34] during the course of the illegal intrusion. Since the discoveries prompting appellant's ultimate arrest—and, crucially, the incidental seizure of the bank statement—came solely in consequence of the in-bank internment and interrogation to which he was subjected,[35] the justification proffered therefor must be scrutinized in the light of governing Fourth Amendment principles.[36]

## A. Terry v. Ohio

Every police detention unconsented to is subservient to that Amendment's strictures on seizure of the person.[37] An arrest—a taking into custody incidental to a charge of crime—calls for probable cause,[38] "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " [39] A temporary restraint for investigative inquiry requires adequate justification, though somewhat weaker and different in character. It was in *Terry* that the Supreme Court set the standards by which hindrances of that nature are to be measured.

*Terry* recognized that there are occasions upon which police need to inquire into ostensible criminal activity in the absence of probable cause supporting an arrest.[40] "[A] police officer," the Court said, "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." [41] At the same time, *Terry* preserved the individual's Fourth Amendment freedom from unreasonable governmental encroachment upon the privacy of his person,[42] and made clear its purpose to exclude evidence gained thereby in order to discourage lawless police con-

---

**31.** See cases cited *supra* note 30.

**32.** E. g., *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321–322 (1920).

**33.** E. g., *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 739 (1961).

**34.** E. g., *McGinnis v. United States*, 227 F.2d 598, 603 (1st Cir. 1955).

**35.** Compare, e. g., *Wong Sun v. United States, supra* note 30, 371 U.S. at 484–485, 83 S.Ct. at 415–416, 9 L.Ed.2d at 453–454 (unlawful entry invalidates subsequent arrest and seizure of evidence).

**36.** "[T]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . ." U.S.Const. amend. IV. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference, unless by clear and unquestionable authority of law." *Terry v. Ohio, supra* note 4, 392 U.S. at 9, 88 S.Ct. at 1873, 20 L.Ed.2d at 898–899, quoting *Union Pac. R.R. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891).

**37.** See note 9 *supra*.

**38.** E. g., *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54, 64 (1975).

**39.** *Id.*, quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964).

**40.** 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.

**41.** *Terry v. Ohio, supra* note 4, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. As the Court later had occasion to remark,

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a *suspicious* individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145–146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616–617 (1972) (emphasis supplied) (citations omitted). See also *United States v. Brignoni-Ponce, supra* note 9, 422 U.S. at 881, 95 S.Ct. at 2580, 45 L.Ed.2d at 616–617.

**42.** *Terry v. Ohio, supra* note 4, 392 U.S. at 9, 88 S.Ct. at 1873, 20 L.Ed.2d at 898–899.

duct.[43] These ends are assured by two requirements laid down by the Court. One is that, "in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[44] The other is that "the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' "[45] As we ourselves have put it, "[s]tops as well as arrests must satisfy the Fourth Amendment's requirement of reasonable cause commensurate with the extent of the official intrusion."[46]

Justification authorizing an investigative street-stop marks the point of accommodation for competing interests in personal privacy and crime detection,[47] no less than probable cause does for an arrest.[48] No wonder, then, that it is of a very special character: "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot . . . ."[49] And in evaluating the occasion for the stop, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"[50] For "[a]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the Supreme] Court has consistently refused to sanction."[51]

### B. Applications of Terry

The distinction, then, is between reasonable grounds for a suspicion—objective facts in light of which the stop appears reasonable—that will support a stop, and intuition, hunch, or mere subjective suspicion that will not.[52] This is well illustrated by one of two incidents before the Supreme Court in

**43.** *Id.* at 12, 88 S.Ct. at 1875, 20 L.Ed.2d at 900–901. See also text *supra* at notes 30–35.

**44.** 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906 (footnote omitted). "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Id.* at 21 n.18, 88 S.Ct. at 1880 n.18, 20 L.Ed.2d at 906 n.18 (citations omitted). That is because "[t]he scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular . . . seizure in light of the particular circumstances." *Id.* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906 (footnote omitted).

**45.** *United States v. Brignoni-Ponce, supra* note 9, 422 U.S. at 881, 95 S.Ct. at 2580, 45 L.Ed.2d at 617, quoting *Terry v. Ohio, supra* note 4, 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910.

**46.** *Young v. United States*, 140 U.S.App.D.C. 333, 336, 435 F.2d 405, 408 (1970).

**47.** *Terry v. Ohio, supra* note 4, 392 U.S. at 9–13, 88 S.Ct. at 1873–1875, 20 L.Ed.2d at 898–901.

**48.** *Gerstein v. Pugh, supra* note 38, 420 U.S. at 112, 95 S.Ct. at 863, 43 L.Ed.2d at 64.

**49.** *Terry v. Ohio, supra* note 4, 392 U.S. at 30, 88 S.Ct. 1884, 20 L.Ed.2d at 911. See also *United States v. Coates, supra* note 16, 134 U.S.App.D.C. at 338 & n.3, 495 F.2d at 164 & n.3. Metropolitan Police Department General Order 304–10 (1973) both incorporates and elucidates the *Terry* criteria. While the prerequisite for a police-citizen "contact is not probable cause, reasonable suspicion, or any other specific indication of criminal activity," *id.* pt. I(A), a "stop" is authorized "[i]f an officer *reasonably suspects* that a person has committed, is committing, or is about to commit any crime," *id.* pt. I(B)(1) (emphasis in original). "Reasonable suspicion" is defined as

more than a hunch or speculation on the part of the officer, but less than the probable cause necessary for arrest. Reasonable suspicion is a combination of specific and articulable facts, together with reasonable inferences from those facts, which, in light of the officer's experience, would justify a reasonable officer in believing that the person stopped had committed, was committing, or was about to commit a criminal act.

*Id.* pt. I(B)(2).

**50.** *Terry v. Ohio, supra* note 4, 392 U.S. at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

**51.** *Id.* at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

**52.** American Law Institute, Model Code of Pre-Arraignment Procedure, Proposed Official Draft Part IA § 110.2(6), at 282 (1975).

*Sibron v. New York.*[53] A policeman kept Sibron under continuous surveillance for eight hours as he conversed successively with a number of known addicts. The officer did not overhear any of their conversations nor did he see anything pass between them. The Court refused to accept those circumstances as a basis for an investigative stop. "So far as [the officer] knew, they might . . . 'have been talking about the World Series.'[54] The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security."[55]

The constitutional necessity for objectively- and reasonably-founded suspicion for a stop is further illustrated by *Brignoni-Ponce,*[56] wherein the Court delineated the power of the Border Patrol to halt automobiles in areas near the Mexican border and inquire into the citizenship and immigration status of the occupants. As posed by the Court, "[t]he only issue presented for decision [was] whether a roving patrol may stop a vehicle in an area near the border and question its occupants when the only ground for suspicion is that the occupants appear to be of Mexican ancestry,"[57] and that issue the Court resolved in the negative. Properly justified, such a procedure would be unobjectionable; "because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border," the Court held "that when an officer's observations lead him reasonably to suspect that a particular vehicle

may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion."[58] Since, however, "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well," the Court recognized that "[t]o approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Boarder Patrol officers."[59] Consequently, the Court was

not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic. . . . [A] requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border area from indiscriminate official interference. Under the circumstances, and even though the intrusion incident to a stop is modest, we conclude that it is not "reasonable" under the Fourth Amendment to make such stops on a random basis.[60]

Moreover, the *Brignoni-Ponce* Court continued, "[f]or the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they

**53.** 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

**54.** *Sibron v. New York, supra* note 53, 392 U.S. at 62, 88 S.Ct. at 1902, 20 L.Ed.2d at 934, quoting the trial judge.

**55.** *Id.*

**56.** *United States v. Brignoni-Ponce, supra* note 9.

**57.** 422 U.S. at 876, 95 S.Ct. at 2578, 45 L.Ed.2d at 614.

**58.** *Id.* at 881, 95 S.Ct. at 2580, 45 L.Ed.2d at 616–617.

**59.** *Id.* at 882, 95 S.Ct. at 2581, 45 L.Ed.2d at 617. A different conclusion would mean that "Border Patrol officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road, without any reason to suspect that they have violated any law." *Id.* at 883, 95 S.Ct. at 2581, 45 L.Ed.2d at 617.

**60.** *Id.* (footnote omitted).

may be aliens."[61] So, tracking *Terry*, the Court proclaimed that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country";[62] and that standard had not been met:

> In this case the officers relied on a single factor to justify stopping respondent's car: the apparent Mexican ancestry of the occupants. We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens. At best the officers had only a fleeting glimpse of the persons in the moving car, illuminated by headlights. Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.[63]

Very similar to these decisions is our own in *Montgomery*.[64] Police officers saw Montgomery drive through a residential area twice, whereupon they followed him around the block and stopped him. Montgomery had observed all relevant traffic and speed laws, and the officers knew of nothing reflecting adversely upon him. Their suspicions were nonetheless aroused by "the manner in which he was encircling the area";[65] "it seemed unusual that he would be encircling like that. There was really no business places around."[66] One of the officers became more skeptical when he "observed [Montgomery] appeared [*sic*] to be watching us in the rear view mirror and looking around."[67] We concluded that these events did not "giv[e] rise to a founded suspicion of wrongdoing."[68] We said:

> [G]ood faith, accompanied only by inarticulate hunch, is not enough for even the temporary "seizure" of a stop. And that is all that appears on this record. The officers saw [Montgomery] some four or five minutes after they originally noticed him, concluded that he had driven around the block, pulled their marked police car behind him and noted that [Montgomery] watched them in his rear view mirror and looked around. This may have been reason for an officer to become suspicious enough to keep an eye on [Montgomery]. But it can hardly be deemed to be an objective indicator of reasonable suspicion of criminal conduct. There are perfectly legitimate reasons for circling a block, perhaps looking for an address in an unfamiliar neighborhood, or for a parking space close to the address sought, or waiting to meet a friend when parking at or near the location is unavailable.[69]

\*    \*    \*    \*    \*    \*

The inarticulate hunch, the awareness of something unusual, is reason enough for officers to look sharp. Their knowledge and experience identify many inci-

---

**61.** *Id.* at 884, 95 S.Ct. at 2581–2582, 45 L.Ed.2d at 618.

**62.** *Id.* (footnote omitted).

**63.** *Id.* at 885–887, 95 S.Ct. at 2582–2583, 45 L.Ed.2d at 619–620 (footnotes omitted).

**64.** *United States v. Montgomery, supra* note 30.

**65.** 182 U.S.App.D.C. at 429, 561 F.2d at 878.

**66.** *Id.*

**67.** *Id.*

**68.** *Id.* at 431, 561 F.2d at 880.

**69.** See further in this connection text *infra* at notes 119–121.

dents in the course of a day that an untrained eye might pass without any suspicion whatever. But awareness of the unusual, and a proper resolve to keep a sharp eye is not the same as an articulated suspicion of criminal conduct. [Montgomery's] acts, as reported, were too innocuous to warrant the intrusion of a temporary seizure for questioning.[70]

Reverting to the case at bar, the question immediately becomes whether, in the totality of the circumstances of his encounter with Officer Franck, appellant's right to personal integrity was violated by what constitutionally amounted to an unreasonable seizure when he was required to go back to the bank for what eventuated as an extended interrogation. The reasonableness of this course of action turns on the facts, viewed objectively,[71] and the central inquiry is whether the officer was "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion."[72] Applying *Terry* criteria to the facts here, I cannot accept the inferences purportedly underpinning the detention to which appellant was subjected.[73]

## III. EVENTS LEADING TO THE DETENTION

The chain of circumstances culminating in appellant's downfall is recounted in the record by Officer Franck himself. He was the only witness at the hearing on appellant's motion to suppress the evidence uncovered after he was brought back to the bank. The officer's testimony on the motion was admitted by stipulation at the ensuing nonjury trial, and the facts to which he testified, as distinguished from the impressions that he derived from those facts, have not been challenged. The events recited herein, then, are as related by the officer at the suppression hearing.

### A. *The Officer's Observations*

From the moment he first laid eyes on appellant, Officer Franck felt that something was odd. It all began one afternoon as the officer commenced a tour of duty inside the bank and spotted appellant 25 feet away[74] awaiting his turn at a teller's window. The officer's attention was drawn to appellant "because he was the only person in the bank that didn't look right in the bank."[75] Appellant "had a good looking

---

**70.** *United States v. Montgomery, supra* note 30, 182 U.S.App.D.C. at 430–431, 561 F.2d at 879–880.

**71.** See text *supra* at note 50.

**72.** See text *supra* at note 44.

**73.** The restraint imposed upon appellant was exacerbated by the fact that he was compelled to forgo the sidewalk and accompany Officer Franck back into the bank for further investigation. While my colleagues treat this as an *innocuous extension of the on-street stop*, I am troubled by the limitation that the Supreme Court associated with permissible investigative activities of the Border Patrol in *United States v. Brignoni-Ponce, supra* note 9. There the Court held that, on reasonably-based suspicion that a particular vehicle may contain illegal aliens, an officer may stop it briefly to inquire into the citizenship and immigration status of the occupants, and may call for explanation of suspicious circumstances, 422 U.S. at 881–882, 95 S.Ct. at 2580–2581, 45 L.Ed.2d at 616–617, but, since "the stop and inquiry must be 'reasonably related in scope to the justification for their initiation,' " see text *supra* at note 45,

"any further detention . . . must be based on consent or probable cause." *Id.* at 882, 95 S.Ct. at 2580, 45 L.Ed.2d at 617. Since, however, I conclude that Officer Franck lacked justification to restrain—as distinguished from approach—appellant for questioning—at any time, on the sidewalk or elsewhere—I do not reach the question whether appellant's rights were violated by his removal to the bank, or whether there was "an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." *Terry v. Ohio, supra* note 4, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16, 20 L.Ed.2d at 905 n.16.

**74.** Tr. 9.

**75.** Officer Franck testified:

My attention was drawn to him because he was the only person in the bank that didn't look right in the bank. He had a good looking jacket on, but his pants were kind of shaggy. He was dressed fairly modestly. He didn't appear to be right inside the bank, to me.

Tr. 9–10.

jacket on"[76] and "was dressed fairly modestly,"[77] though "his pants were kind of shaggy."[78] Still, to the officer "[h]e didn't appear to be right inside the bank. . . ."[79]

As appellant stood in line, Officer Franck noticed that he held a piece of blue paper in his hand. The officer did not know what the paper really was but assumed that it was a check.[80] So, when appellant handed the paper to the teller, and after examination the teller returned it to appellant with an unelucidated reference to a "bank official,"[81] Officer Franck thought he was watching an effort to cash a check.[82] "What I saw in his hand looked like a check,"[83] he said; "[i]t was Tuesday afternoon. I thought it was an unusual time for somebody to be cashing their pay check."[84] As we know, appellant received no money from the teller, a circumstance that the officer deemed not necessarily criminal, but "unusual."[85]

As appellant left the window, he saw Officer Franck for the first time. "We had eye contact for three to five seconds. Maybe six seconds,"[86] the officer related; "[h]e turned away. From that time on, he avoided any kind of looking at me at all."[87] After speaking briefly to a bank official,[88] and as Officer Franck "started moving toward him, . . . [appellant] started walking fast out of the bank, not at the same pace he had been moving"[89]—so fast, the officer declared, that "when I went after the man, I had to trot to catch up with him on the sidewalk."[90]

It was then that Officer Franck intercepted appellant on the sidewalk. "I stopped him," the officer explained, "because I thought he was trying to cash a check, and it didn't seem right to me that a man that was trying to cash a check would walk out of the bank without his check being cashed."[91] Appellant unhesitatingly honored Officer Franck's request for a chat.[92] He waited while the officer obtained a form from his scooter and entertained questions while the officer recorded his answers on the form.[93] Asked his name, appellant said "William Witherspoon";[94] he also supplied an address[95] and a relative's telephone number,[96] and the officer had no objective basis for doubting any of that information.[97]

Appellant told the officer that he had no identifying document other than a withdrawal slip that he had filled out in the bank in order to obtain money from his savings account.[98] At the officer's suggestion, he handed over the slip, upon which was written the same name he had previ-

**76.** See note 75 *supra.*

**77.** See note 75 *supra.*

**78.** See note 75 *supra.*

**79.** See note 75 *supra.*

**80.** Tr. 9.

**81.** Tr. 11.

**82.** Tr. 9, 22, 25.

**83.** Tr. 22.

**84.** Tr. 22.

**85.** Tr. 16.

**86.** Tr. 22.

**87.** Tr. 22. See also Tr. 12.

**88.** Tr. 23.

**89.** Tr. 12.

**90.** Tr. 12. See also Tr. 23.

**91.** Tr. 25. The officer added, "[a]nd he didn't have any I.D. with him." The court then asked, "[y]ou didn't know he didn't have any I.D. until you stopped him out on the sidewalk?" Tr. 25. The officer responded, "I never saw him present any I.D. at the teller's window." Tr. 25.

**92.** Tr. 13.

**93.** See Maj.Op. at note 2.

**94.** Tr. 13.

**95.** Tr. 13–14.

**96.** Tr. 14.

**97.** See Tr. 8, 10, 17.

**98.** Tr. 14.

ously given [99] and, as the officer was later to testify, he "realized that it was a withdrawal slip, yes, sir." [100]  Appellant explained that he had mistakenly put his checking-account number instead of his savings-account number on the slip, and thus was unable to effect a withdrawal. [101]  Notwithstanding, the officer shortly thereafter subjected appellant to restraint with the proposal that they go back to the bank for further investigation. [102]

One may comb the officer's detailed narrative of the developments forerunning appellant's in-bank detention for "specific and articulable facts  .  .  .  reasonably warrant[ing] that intrusion" [103] but the effort, I submit, is doomed to failure.  To begin with, to stand in line for a bank teller's handling of what appears to be a check is certainly no oddity.  The officer had never seen appellant prior to that day; [104] he did not know whether he was a customer of the bank; [105] indeed, he "[d]idn't know a thing about him." [106]  Nor was there anything exceptional about appellant's attire, as described by the officer, [107] to attract a bystander's special attention.  Officer Franck's impression that appellant "was the only person in the bank that didn't look

right in the bank" [108] was no more or less than a subjective hunch of the first order. [109]

Somewhat more palatable is the officer's mistaken belief that the blue slip in appellant's hand was a check. [110]  But the notion that it is "unusual" for a person to cash his pay check on a Tuesday afternoon [111] strikes me as absurd.  People cash checks at banks all the time; a better place to do so is difficult to imagine.  And the officer's extrapolation from a blue slip to a check thence to a pay check [112] hardly qualifies as a gem of deduction.  I cannot indulge a higher rating to Officer Franck's impression that the fact that the check was not cashed was "unusual." [113]  A check-cashing effort may founder from any number of difficulties, and the teller's window is a likely place for discovering them.  I find it difficult to believe that reasonable-minded people would perceive anything peculiarly criminal about "a man that was trying to cash a check [who] walk[s] out of a bank without his check being cashed." [114]

Much the same must be said for the "eye contact," and the subsequent "avoid[ance]" of such contacts, to which Officer Franck attached importance. [115]  Many if not most of us would consider a glance of three to six

99.  Tr. 14.

100.  Tr. 17.

101.  Tr. 14.

102.  Tr. 14–15.  Just prior thereto, Officer Franck radioed in the name "William Witherspoon" for a check on outstanding warrants, but did not await a response.  Tr. 19–20.

103.  See text *supra* at note 44.

104.  Tr. 8.

105.  Tr. 8.

106.  Tr. 10.

107.  See text *supra* at note 75.

108.  See text *supra* at note 75.

109.  See *United States v. Hostetter*, 295 F.Supp. 1312, 1316 (D.Del.1969); *Baker v. State*, 478 S.W.2d 445, 446, 449 (Tex.Crim.App.1972).  I recognize that "in determining whether the officer acted reasonably in [the] circumstances, due weight must be given  .  .  .  to the

specific reasonable inferences which he is entitled to draw from the facts in light of his experience."  *Terry v. Ohio, supra* note 4, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.  See also, *e. g., United States v. Hall*, 174 U.S. App.D.C. 13, 15, 525 F.2d 857, 859 (1976); *United States v. Davis*, 147 U.S.App.D.C. 400, 403, 458 F.2d 819, 822 (per curiam 1972).  But in the end the question is whether "the facts available to the officer at the moment of the seizure  .  .  .  'warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate[]."  See text *supra* at note 50.

110.  See text *supra* at notes 80, 83.

111.  See text *supra* at note 84.

112.  See text *supra* at note 84.

113.  See text *supra* at note 85.

114.  See text *supra* at note 91.

115.  See text *supra* at notes 86–87.

seconds[116] at a uniformed policeman[117] some distance away[118] enough for any one afternoon. The officer's concern over this aspect of the encounter is akin to a recently-spurned assertion that a driver trailed by a marked police car "appeared to be watching us in the rear view mirror and looking around."[119] We dismissed that impression with the admonition that "[t]o consider mirror glance as enough for a seizure, however temporary, is to accept the adequacy of 'inarticulate hunches.'"[120] Pedestrains, no less than "[d]rivers[,] simply do take notice that the police are nearby,"[121] and then adore or ignore them as they please.

Moreover, the "eye-contact" episode bears the unmistakable earmark of a hopeless dilemma for appellant. By Officer Franck's own description, after the first sighting nothing transpired that objectively could have augured the likelihood that appellant would have gazed at the officer again. After the transaction at the cashier's window aborted, appellant walked toward the bank officer and then out through the door. Had he turned for one more look at Officer Franck, he would have left himself open to the ever-suspicious policeman's hunch—as did the driver in the case just mentioned—that appellant was giving him a "furtive" glance.

There was also appellant's brisk exit from the bank, with Officer Franck "trot[ting]" after him.[122] It may suffice merely to observe that when a patron's business with a bank is at least temporarily at end there is little or no occasion to tarry. To boot, one departing may not unnaturally walk through an exit faster than he previously did in point-to-point movement inside a bank. And it is hardly surprising that Officer Franck had to "trot" in order to catch up with appellant on the sidewalk since the officer was some distance away when he started.[123] But lest it be thought that appellant's exit had implications as a possible flight from the officer, a few additional remarks are in order. Flight may, of course, have significance in particular contexts,[124] but always there are "dangers inherent in unperceptive reliance upon flight as an indicium of guilt,"[125] and it is never a "reliable indicator of guilt without other circumstances to make its import less ambiguous."[126] The short journey from the bank's interior to the sidewalk outside could hardly be deemed flight in any event,[127] and surely any temptation to do so is removed

116. See text *supra* at note 86.

117. At the time, Officer Franck was in uniform and wearing his helmet. Tr. 7.

118. Tr. 9.

119. *United States v. Montgomery, supra* note 30, 182 U.S.App.D.C. at 429, 561 F.2d at 878.

120. *Id.* at 430–431, 561 F.2d at 879–880, quoting *Terry v. Ohio, supra* note 4, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

121. *United States v. Montgomery, supra* note 30, 182 U.S.App.D.C. at 431, 561 F.2d at 880.

122. See text *supra* at note 90.

123. Tr. 9, 12, 23.

124. "With cautious application in appreciation of its innate shortcomings, flight may under particular conditions be the basis for an inference of consciousness of guilt." *Bailey v. United States*, 135 U.S.App.D.C. 95, 100, 416 F.2d 1110, 1115 (1969) (footnote omitted). See also, *e. g.,* the cases cited *id.* at 99 n.29, 416 F.2d at 1114 n.29.

125. *Id.* at 99, 416 F.2d at 1114 (footnote omitted). See also *Wong Sun v. United States, supra* note 30, 371 U.S. at 483 n.10, 83 S.Ct. at 415 n.10, 9 L.Ed.2d at 452 n.10; *Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051, 1056 (1896); *Hinton v. United States*, 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969).

126. *Hinton v. United States, supra* note 125, 137 U.S.App.D.C. at 391, 424 F.2d at 879 (footnote omitted).

127. "The term 'flight' is often misused for 'departure.' Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt. . . . For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." *State v. Sullivan*, 43 N.J. 209, 203 A.2d 177, 192 (1964), *cert. denied*, 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966).

when it is recalled that appellant unhesitatingly honored the officer's request to halt and thereafter cooperated fully throughout the stop.[128] These contemporaneous circumstances unmistakably negate any different import that otherwise might be thought to follow.

### B. *The Lack of Documentary Identification*

This brings us to the episode on the sidewalk, and to Officer Franck's unfruitful call upon appellant for documented personal identification. My colleagues and I are as one in the view that prior to that call the officer did not have sufficient ground to impose any kind of restriction on appellant.[129] What we disagree over is the significance, in the totality of the circumstances, of appellant's inability to produce the required documentation.[130] What now follows is my assessment of that branch of the case.

When the subject of identification arose, Officer Franck was under the erroneous impression that appellant had attempted to cash a check in the bank. So, his admitted lack of identifying documents "[r]ight away . . . struck [the officer as] funny"; [131] "[w]hy," he asked himself, "does a man go to a bank to cash a check without some sort of identification[?]" [132] But the officer's underlying supposition was promptly dispelled. Appellant explained that his purpose had been to withdraw funds from a savings account, and handed the blue withdrawal slip to the officer as proof.[133] The officer examined the slip, recognized it as the one he had seen in the bank and realized just what it was.[134] Thus the theory that until then had so firmly welded the officer's attention on appellant—a check-cashing mission in the bank—suddenly evaporated.

Nonetheless, Officer Franck, in his own words, "proceeded to ask [appellant] why he didn't have any identification when he was in the bank." [135] He then was told that

---

**128.** See text *supra* at notes 92–101.

**129.** Maj. Op., 186 U.S.App.D.C. at ——, 569 F.2d at 69.

**130.** It cannot be said that appellant *refused* to identify himself—a circumstance that in particular contexts might bear significance. Compare Model Penal Code § 250.6 (1962); Metropolitan Police Department General Order 304–10 pt. I(B)(4)(d) (1973). Appellant gave Officer Franck a name and a savings withdrawal slip bearing that name—albeit a false name, but the officer had no way of knowing that it was false. All concerned have viewed the matter as one of inability to produce documentation of identification, and so do I.

**131.** The officer's testimony in this regard is as follows:

I asked the man if he had any identification. He said, "No, I don't have any identification."

Right away it struck me funny. Why does a man go into a bank to cash a check without some sort of identification.

I asked him again, "Are you sure you don't have any identification." He said, "No. All I have is the withdrawal slip." I asked him what he was doing in the bank. He said, "I have a withdrawal slip." I said, "A withdrawal slip from where, sir?" He said, "I was going to withdraw some money out of my savings account."

I said, "May I see that, sir, for some identification." He took the brown envelope out of his pocket and presented me with the blue slip of paper that I had previously seen inside the bank. And on the blue slip of paper was the name William Witherspoon that I, therefore, transferred down to this card.

And I proceeded to ask him why he didn't have any identification when he was in the bank. He said that he went into the bank and made a mistake. He tried to get some money from his savings account, and he had the checking account number down there.

I know my checking account number, and I know my savings account number in my bank. I know they are not alike.

I started asking questions. The questions were general questions, but everything was funny.

I asked him—I said, "Mr. Witherspoon, would you mind coming back inside the bank with me, and we will talk to the manager, and if everything is okay, you can go."

Tr. 14–15.

**132.** Tr. 14.

**133.** Tr. 14.

**134.** Tr. 14–15.

**135.** Tr. 14.

appellant had mistakenly written his checking account number on the slip.[136] Still, to the officer, "everything was funny":

I know my checking account number, and I know my savings account number in my bank. I know they are not alike.

I started asking questions. The questions were general questions, but everything was funny.

I asked him—I said, "Mr. Witherspoon, would you mind coming back inside the bank with me, and we will talk to the manager, and if everything is okay, you can go." [137]

This I read as a statement that the situation seemed "funny" to Officer Franck because appellant apparently could not distinguish between checking and savings account numbers, an approach, I submit, that succumbs to *Terry's* requirement of objective unreasonableness.[138] It simply defies experience as well as logic to argue that one is likely to be a criminal just because he cannot remember or differentiate between his bank account numbers. Officer Franck was, however, to voice another concern:

I never saw him present any I.D. at the teller's window. When I asked him for I.D. outside [the bank], he stated that he didn't have any. That was another thing that got me to wondering why a man would go into a bank without I.D.

I have been in a bank, and they won't accept my badge and I.D. card. I have to have a driver's license, too.[139]

And the court echoes much the same theme:

[I]t is unusual for an individual to attempt to withdraw money from a personal savings account without being prepared to display some evidence that he owns or controls the account—a savings passbook or bank account identification card, if not additional identification as well—and, in light of what he had observed in the bank, Officer Franck could reason-

ably have suspected, when the only identification appellant was able to produce was the disputed transaction slip itself, that he had attempted to withdraw money from someone else's account.[140]

Both the officer and my colleagues, I think, presume entirely too much. By far the most reasonable deduction from Officer Franck's in-bank observations and appellant's lack of identification was that a bank customer had forgotten to bring along data, including identification, needed to consummate his mission; that he had tried to improvise by recalling his account number; and that, having been informed by the teller that his memory was faulty, he had given up and started home.

Everyday experience teaches that we often fall short in even the most elementary precautions for any number of commonplace events. We get caught in showers without umbrellas or raincoats; we get involved in vehicular collisions with seat belts unfastened; and we lock ourselves out of our homes. Of a piece with these mental slips are not infrequent aberrations in documental preparations for the transactions we contemplate. We arrive at supermarkets without our wallets, at shopping centers without our credit cards, and at performances without our pre-purchased tickets; we even drive our cars blissfully unaware that we have neglected to bring along our operator's permits and registration cards. Who among us, including those who pride themselves for care and forethought, has not at some time or another undergone such a lapse? I daresay that appellant, for all Officer Franck knew, could have been but one of a countless number who, for any of many reasons, has arrived at a bank teller's window for a savings withdrawal without any kind of identification whatsoever.

So long as man remains as fallible as he is in almost every endeavor imaginable, I

---

**136.** Tr. 15.

**137.** Tr. 15.

**138.** See text *supra* at note 50.

**139.** Tr. 25.

**140.** Maj. Op., 186 U.S.App.D.C. at ——, 569 F.2d at 69.

cannot accept the episode in suit as the extraordinary event my colleagues believe it was. Much less can I conceive of it as an objective portent of crime in a Nation that does not—or, until today's decision, did not—require its citizens to carry identification.[141] To an unbiased observer knowing no more than Officer Franck, the simple lack of a passbook, bank card or other documentation of personal identity or account-ownership is all too easily attributable to carelessness, absent-mindedness or sheer ignorance of the mechanics of withdrawal.[142] Moreover, appellant's inability to produce evidence of that sort is too bland a circumstance to connote criminality objectively. If, as my colleagues gratuitously assume, savings withdrawals at the National Bank of Washington are conditioned upon presentation of a particular type of such document,[143] an inability to do so expectably would result merely in the bank's refusal to permit the sought-after withdrawal.[144] That consequence hardly comports with the sophistication normally associated with criminals who prey on banks.

The *Terry* standards defining permissible stops based on ostensible criminality from observed facts bear repeating. Before a stop may be imposed, "the facts available to the officer at the moment of the seizure," viewed objectively,[145] must be such as would " 'warrant a man of reasonable caution in the belief[ ]' that the action taken was appropriate[.]" [146] Obviously, any inference of criminality becomes weaker as, in terms of ordinary experience, the possibility of innocent explanation looms larger. And even when the circumstances call for some amount of investigation, "the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " [147] That one converses with a succession of addicts does not reasonably give rise to an inference that he is engaged in narcotics traffic.[148] That one apparently of Mexican ancestry occupies an automobile near the Mexican border does not warrant an infer-

---

**141.** See *Wainwright v. City of New Orleans,* 392 U.S. 598, 604, 88 S.Ct. 2243, 2248–2249, 20 L.Ed.2d 1322, 1325–1326 (1968) (Warren, C. J., dissenting). And because identification might be useful to almost anyone on almost any day, policemen will no doubt read the majority opinion as labeling "suspicious" in *Terry* terms everybody unable to produce identification on request. The decision is thus tantamount to a requirement that all citizens carry identification at all times, and present it to police officers when called upon to do so. Imagine the uproar by our citizens—who by and large value their privacy and their individuality—had Congress attempted to enshrine such a proposition in legislation.

**142.** At most, Officer Franck's observations of appellant's activities inside the bank presented an occasion only to keep an eye on him, and reason to watch closely is not necessarily reason to effect a detention:

> The inarticulate hunch, the awareness of something unusual, is reason enough for officers to look sharp. Their knowledge and experience identify many incidents in the course of a day that an untrained eye might pass without any suspicion whatever. But awareness of the unusual, and a proper resolve to keep a sharp eye, is not the same as an articulated suspicion of criminal conduct.

*United States v. Montgomery, supra* note 30, 182 U.S.App.D.C. at 430, 561 F.2d at 879.

**143.** Since the record is silent on the methodology of savings withdrawals at the National Bank of Washington, we are completely in the dark as to whether its savings customers must present a passbook, an account card or any other documentation whatever. It is known, however, that banks generally have long relied heavily if not exclusively upon the customer's signature as proof of the genuineness of an order to pay funds from a particular account. Consequently, personal identification or other evidence of account-ownership may not be nearly as vital to a withdrawal transaction as my colleagues believe. And if it is the signature rather than indicia of other types that is vital, one's lack of documentation while undertaking a savings withdrawal would not be unusual at all.

**144.** The important consideration for *Terry* purposes, of course, is not what the bank's practice actually is, but what Officer Franck knew or reasonably believed it to be. Officer Franck candidly admitted, however, that he had no knowledge or information whatever in that regard. Tr. 7.

**145.** See text *supra* at note 50.

**146.** See text *supra* at note 50.

**147.** See text *supra* at note 45.

**148.** See text *supra* at note 55.

ence that he is an alien illegally in the country.[149] That one circles a residential area with an eye for the presence of policemen does not logically generate an inference that he is a would-be burglar.[150] In none of these instances did the circumstances respectively appearing justify an investigative stop.[151] I say that the mere fact that one who applies for a savings withdrawal without the necessary credentials on his person is not so singular as to imply fairly and objectively an effort to defraud the bank, or to support a detention for further inquiry in that regard.[152]

In my view, then, appellant's Fourth Amendment "right . . . to be secure in [his] person[ ] . . . against unreasonable . . . seizure[ ]"[153] was infringed when Officer Franck escorted him back into the bank. In so concluding, and despite my difficulties with the officer's course of reasoning, I intend no impugnation of his sincerity. His testimonial performance symbolizes, for me at least, the dedicated policeman endeavoring conscientiously to do his job as best he can, but constitutionally speaking that is beside the point. "If subjective good faith alone were the test, protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects' only in the discretion of the police."[154]

## IV.  CONCLUSION

Most assuredly, the court's holding in this case offers no haven for the absent-minded. At bottom, it means that one must always remember to carry personal identification when setting out for the bank.  It means, too, that one must never forget to bring along his checkbook, his passbook or whatever else customarily facilitates the transaction in mind.  Otherwise, given the court's broad authorization of intrusive and embarrassing investigation, a forgetful bank customer seeking only to conduct legitimate business could be halted and interrogated on the spot.  I would not expect difficulties of that sort to be limited only to those who have occasion to frequent banks.

To be sure, policemen must have leeway to investigate crime, incipient or ongoing. But the fundamental question is whether the Constitution indulges as much room as my colleagues yield, and I for one believe that it does not.  *Terry* effected a careful balance between the needs of policework and personal privacy.  The balance remains true only so long as each interest is maintained and protected in its own proper sphere.  Today's decision upsets that balance by setting, albeit undesignedly, a trap for the absent-minded innocent.  Those who view that with equanimity if not enthusiasm could benefit from what we ever so recently said,

[a]ny decision that holds a "stop" to be an unlawful intrusion on privacy invites hy-

149.  See text *supra* at note 63.

150.  See text *supra* at note 69.

151.  See Part II(B).  Those cases demonstrate that it is not enough that the presence of the factor in question makes it more likely that criminality is afoot than when the factor is absent.  *Terry* teaches that there must be no likely nonsuspicious explanation.  *Terry v. Ohio, supra* note 4, 392 U.S. at 22–23, 88 S.Ct. at 1880–1881, 20 L.Ed.2d at 906–907.  And *Brignoni-Ponce* reemphasizes the danger of allowing police to "seize" persons on the basis of factors, like ancestry and lack of identification, that less rather than more often are hallmarks of criminality.  See text *supra* at notes 56–63.

152.  I am mindful that relevant events are to be appraised as a whole rather than singly, *e. g., Terry v. Ohio, supra* note 4, 392 U.S. at 22–23, 88 S.Ct. at 1880–1881, 20 L.Ed.2d at 906–907;

*United States v. Davis, supra* note 109, 147 U.S.App.D.C. at 402, 458 F.2d at 821, and resultantly that appellant's lack of identifying documents must be indulged any significance that antecedent factors might afford.  But I am unable to see how Officer Franck's nebulous forerunning impressions—appellant's attire, his disdain of repeated "eye contacts" and his lively exit from the bank, see Part III(A) *supra* —could succeed in imparting a cast of criminality to a circumstance so readily explainable and naturally acceptable as just another instance of human absent-mindedness.

153.  See note 36 *supra*.

154.  *Beck v. Ohio, supra* note 39, 379 U.S. at 97, 85 S.Ct. at 229, 13 L.Ed.2d at 148, quoted in *Terry v. Ohio, supra* note 4, 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

perbolic opposition on the ground of unreasonable interference with police officers who were only acting reasonably in coping with criminals. Of course those who come into court are criminals. The other citizens who were stopped and delayed in their pursuits were not charged and so the cases do not erupt in court.

Doubtless more crimes would be solved if all persons were subject to unrestricted police authority to stop and identify. Why not, it might be argued, since the innocent will have nothing to hide? If one is not sensitive to the implications for an open society, no amount of comment can explicate.[155]

---

155. *United States v. Montgomery, supra* note 30 561 F.2d at 887, 182 U.S.App.D.C. at 438.